**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------x
                                 :

**UNITED STATES OF AMERICA**     :

                                 :

        **-v.-**                  :     **07 Cr. 537 (WHP)**

                                 :

**DAVID RAYMOND CARMEL,**     :

                                 :

        **Defendant.**       :
----------------------------------------------------------x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S PRE-TRIAL MOTIONS

 

MICHAEL J. GARCIA
*United States Attorney for the*
*Southern District of New York*

Rosemary Nidiry
*Assistant United States Attorney*
    *– Of Counsel –*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.    The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.    Carmel's Arrest and Post-Arrest Interview . . . . . . . . . . . . . . . . . . . . 6

        C.    The Chippewa County Search Warrant . . . . . . . . . . . . . . . . . . . . . . . . 8

        D.    The Federal Search Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        F.    The Western District of Wisconsin Criminal Case . . . . . . . . . . . . . . . . 15

            1.    The Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            2.    Defendant's Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                a.    Defendant's Motion for a *Franks* Hearing . . . . . . . . . . 16

                b.    Defendant's Motion to Quash the Chippewa County
                     Search Warrant for Lack of Probable Cause . . . . . . . . . . 18

            3.    Guilty Plea and Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    Point I:    The Government Consents To A
               Hearing On Defendant's *Miranda* Claim    . . . . . . . . . . . . . . . . . . 21

    Point II:    Carmel's Suppression Motion Should Be Denied . . . . . . . . . . . . . . . . 23

        A.    The Applicable Law: "Probable Cause" Standards . . . . . . . . . . . . . . . . 24

        B.    The Chippewa County Search Warrant Was
             Supported By Probable Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        C.    The Federal Search Warrant Was
             Supported By Probable Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        D.    Even if the Information Presented in the Affidavits

Did Not Provide Sufficient Probable Cause and/or
Was Stale, the Evidence Should Not Be Suppressed
Because the Investigating Agents Relied in Good Faith
on the Warrants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

E.    The Evidence Obtained Was Well Within
The Scope of the Search Warrants. . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Point III:    Defendant's Request For A *Franks* Hearing Should
Also Be Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

A.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

B.    The Holum Affidavit
Provides No Basis for a *Franks* Hearing . . . . . . . . . . . . . . . . . . . . . . . 47

C.    The Sellner Affidavit
Provides No Basis for a *Franks* Hearing . . . . . . . . . . . . . . . . . . . . . . . 48

Point IV:    The Inventory Provided In Connection With The Search
Complied With The Requirements Of Rule 41(f) . . . . . . . . . . . . . . . . . 50

Point V:    Defendant's Motions for *Brady* and *Giglio*
Material Should Be Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

A.    The Defendant's Request for an Order Directing
the Government to Disclose Additional Alleged
*Brady* Material Is Baseless and Should Be Denied . . . . . . . . . . . . . . . 54

B.    The Defendant's Request for an Order Directing
Early Production of *Giglio* Material Should
Also Be Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

LIST OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA           :

            -v.-                        :        07 Cr. 537 (WHP)

DAVID RAYMOND CARMEL,              :

            Defendant.            :
--------------------------------------------------------x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S PRE-TRIAL MOTIONS

### PRELIMINARY STATEMENT

       The Government respectfully submits this memorandum in response to the pre-trial motions filed by defendant David Raymond Carmel.  Defendant seeks to suppress: (1) the statement obtained by law enforcement agents from the defendant at the time he was arrested (Notice of Motion of David Carmel ("Def. Notice")[1] at  ¶ (1)) on the ground that, while he was properly advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 474 (1966), he nevertheless invoked his right to remain silent and for counsel; and (2) physical evidence seized from the defendant's residence pursuant to state and federal search warrants on the grounds that the applications "were stale, [and] failed to establish probable cause ... ; that evidence outside the scope of the warrant was seized; and that the inventory and return procedures of [Federal] Rule [of Criminal Procedure] 41 were intentionally disregarded" (*id*. at ¶ (2)).  Defendant also requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) (the "*Franks* Motion") (*id.*) regarding the contents of the affidavits supporting those search warrants.  Finally, defendant

---

    [1]Defendant's Notice of Motion is referred to herein as "Def. Notice".  The brief filed in support of defendant's motion is referred to as "Def. Br.".

requests an order directing the Government to disclose material pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and *United States v. Giglio*, 450 U.S. 150, 154 (1972).

The Government consents to a hearing on Carmel's motion to suppress his post-arrest statement as set forth below. At that hearing, the Government is prepared to prove through the testimony of law enforcement witnesses that Carmel knowingly waived his right to counsel and agreed to speak with law enforcement.

Defendant's motion to suppress the physical evidence seized pursuant to the validly-issued search warrants should be denied without a hearing. Contrary to defendant's contention, both the state and federal warrants were amply supported by probable cause and were not based on "stale" information; the evidence seized did not fall outside the scope of the warrants; and there was no "deliberate[] disregard" on the part of the agents of Federal Rule of Criminal Procedure ("Fed. R. Crim. P.") 41 in the execution of the search or the post-search return and inventory procedures. Additionally, defendant's *Franks* Motion is based on wholly unsupported allegations about deficiencies in the contents of the warrant affidavits. Because the defendant has failed to proffer evidence sufficient to make the substantial preliminary showings of *scienter* and materiality required by *Franks*, defendant's suppression motion should be denied without a hearing. Defendant has not, and cannot, overcome the strong presumption of validity accorded to warrants approved by a neutral magistrate.

Finally, as we have advised the defendant, the Government is unaware of any *Brady* material at this time. Should this change, the Government will comply with its *Brady* obligations promptly. Moreover, the Government will produce any *Giglio* material at the time it provides prior statements of witnesses pursuant to 18 U.S.C. § 3500. Accordingly, defendant's

2

request that the Court order the Government to disclose *Brady* and *Giglio* material should be denied.

## BACKGROUND

### A.    The Complaint

David Raymond Carmel was charged in the Southern District of New York in a federal Complaint, based on an affidavit by Special Agent Lori Iadovito of the U.S. Department of Defense, Office of Inspector General, Defense Criminal Investigative Services (DCIS), dated May 21, 2007 ("Iadovito Complaint")[2] with three counts of selling stolen government property in connection with his involvement in selling weapons-mounted infrared laser-aiming light sources ("PEQ") to an undercover officer on three separate occasions. A PEQ is manufactured by Insight Technology, Inc. ("Insight Technology" or "Insight") "for military and law enforcement use only." (Iadovito Complaint, ¶3a). Pursuant to governing Department of Defense ("DOD") policy, "when any of these devices are no longer in military use, their key 'points' or components are to be cut, crushed, broken, or melted 'to the degree required to preclude repair or restoration to original intended use.'" (*Id.* ¶3a (quoting Defense Demilitarization Manual 4160.21-M-1, Category XII (B), (E)(1) (October 1991))).

In April 2006, agents of the Bureau of Immigration and Customs Enforcement ("ICE") identified a number of items being offered for sale on eBay, the online auction site, by the username "theoldeman". Investigation established that this username was registered to the defendant's father, who was offering to sell a "'destroyed' Leupold rifle scope." (Iadovito Complaint, ¶4). An ICE agent, acting in an undercover capacity ("UC"), sent "theoldeman" an

---

[2]The Iadovito Complaint is attached as Exhibit A.

email asking about purchasing Leupold scopes in better condition.  In response, the UC was referred to the defendant David Carmel and given the defendant's telephone number. (*Id.*).

On or about April 27, 2006, the UC spoke with the defendant in a consensually recorded telephone conversation.  During that call, Carmel gave the UC his email address and arranged for the sale of a Leupold scope and one PEQ. (*Id.* ¶5).  Among other things, Carmel remarked in that recorded conversation that he had "some laser sighting stuff ... various night vision things"; cautioned that PEQs were "never, ever, ever, ever, ever sold on the civilian market to anyone ..."; and advised the UC, "[k]eep it to yourself.  Federal government does not want you to have that." (*Id.* ¶5).  Carmel added that "I still know a lot of people still in [the military] and for the most part anything is relatively available ...." (*Id.*).

On or about May 1, 2006, the UC negotiated with Carmel the sale of the rifle scope for approximately $700 and the PEQ for approximately $1,500. (*Id.* ¶7).  On or about May 4, 2006, the UC sent to Carmel money orders in the amount of approximately $2,225, and on or about May 15, 2006, the ICE Manhattan office received a package containing one Leupold rifle scope and one PEQ. (*Id.* ¶7).  The return address on the package read: "Mr. David R. Carmel, 35060 225th Avenue, Gilman, WI 54433-9548." (*Id.*)  By tracking the serial number through the manufacturer's and military records, agents determined that the PEQ had been manufactured by Insight Technology for DOD and originally sent to a military base in Hawaii. (*Id.*).

On or about May 18, 2006, the UC had another consensually recorded telephone conversation with Carmel. (*Id.* ¶8).  In this conversation, Carmel said he had other PEQs available at the same price of approximately $1,500, "'but it ain't from me'." (*Id.*).  On or about June 5, 2006, "Carmel agreed to sell to [the] UC a PEQ for $1,500 along with some M60 gun

4

parts and a Light Interference Filter." (*Id.*). A few days later, the UC mailed $2,060 in money orders to Carmel; Carmel confirmed email receipt of the funds on June 16, 2006. (*Id.*). Subsequently, on or about June 20, 2006, the ICE Manhattan office received a package containing the gun parts, filter, and a PEQ; the package had the same return address, "Mr. David R. Carmel, 35060 225th Ave, Gilman, WI 54433." (*Id.*). By tracking the serial number through the manufacturer's and military records, agents determined that the PEQ had been manufactured by Insight Technology for DOD and originally sent to a military base in Hawaii. (*Id.*).

On or about January 20, 2007, the UC emailed Carmel about purchasing another PEQ. (*Id.*¶9). On or about February 5, 2007, Carmel agreed to sell the UC two PEQs for approximately $3,200; the UC then sent Carmel three money orders totaling approximately $3,000 on or about February 15, 2007. (*Id.*). On or about February 23, 2007, Carmel confirmed by email that he had received the money orders and shipped the PEQs. (*Id.*). Subsequently, on or about February 26, 2007, the ICE Manhattan office received a package containing two PEQs; the package had the same return address, "Mr. David R. Carmel, 35060 225th Ave, Gilman, WI 54433." (*Id.*). By tracking the serial number through the manufacturer's and military records, agents determined that these two PEQs had been manufactured by Insight Technology, and had been "ordered by the DOD's Defense Finance Accounting Service and picked up by or drop-shipped to a military base." (*Id.*).

A review of military records revealed that, until May 31, 2005, Carmel had been a lieutenant in the United States Navy, on active duty as the supply officer to the USS Shrike, a minesweeper stationed in Texas. (*Id.* ¶6). Through his position on the Shrike, Carmel had "electronic access to inventories of supply depots of all the armed services worldwide" and

"caused the USS Shrike to purchase hundreds of PEQs, machine gun barrels, night vision goggles, and various machine gun parts through the Naval Supply system." (*Id.*).  According to Carmel's former supervisor, "the USS Shrike never needed or used any such equipment and Carmel was relieved of his duties as supply officer for misappropriating government property and misuse of his authority." (*Id.*).  Carmel separated from the Navy Reserves on or about November 30, 2005, at which time he moved to his family's residence in Gilman, Wisconsin. (*Id.*).[3]

**B.**     **Carmel's Arrest and Post-Arrest Interview**

Carmel was arrested on the charges in the Iadovito Complaint in Gilman, Wisconsin, after law enforcement agents, who were conducting surveillance on him, pulled over the car he was driving based on an observed traffic violation.  Agents of ICE, DCIS, the Bureau of Alcohol Tobacco and Firearms (ATF), and the Sheriff's Office of Chippewa County, Wisconsin, assisted in the arrest.

After Carmel's arrest, agents orally advised him of his constitutional rights. Carmel was also provided a form entitled "STATEMENT OF RIGHTS", which set out his rights and contained a section entitled "WAIVER OF RIGHTS" with a signature line at the bottom, which he signed along with two agents.[4]  As set forth in the report of Carmel's interview

---

[3]On June 13, 2007, a grand jury in the Southern District of New York returned an Indictment ("Indictment") based on the allegations in the Iadovito Complaint charging Carmel with three counts of selling stolen government property and aiding and abetting the same, in violation of Title 18, United States Code, Sections 641 and 2.  The Indictment also included a Forfeiture Allegation seeking forfeiture of approximately $6,000.

[4]The signed waiver of rights form, provided to defense counsel in the Government's initial production pursuant to Fed. R. Crim. P. 16 on February 12, 2008, is attached as Exhibit B.

("Interview Report"), the following, among other things, occurred during the interview:[5]

(1) Carmel stated that he had one registered machine gun, which was an "MG M-119 9mm submachine gun" and "several firearms and rifles ... [and] various night vision equipment and parts of Russian origin" (Interview Report, Exh. C, at 1);

(2) When questioned "regarding the amount of firearms he was in possession of, Carmel refused to answer the questions but agreed to continue the interview with a different line of questioning" (*id.*);

(3) In response to questioning about infrared laser-aiming devices, Carmel stated he was familiar with the devices and was aware that AN/PEQ-2As and AN/PAQ-4Cs were both infrared laser-aiming devices; that he had "about half a dozen AN/PEQ-2As at his residence, some of which were demilitarized"; that the units were purchased from "Jim LNU of the Bedford Army Surplus store"; that he had purchased some non-functioning items from the same business; and that he had sold some "to an individual named 'Tony' and other individuals for approximately $1,000 per unit" (*id.*);

(4) Carmel advised agents that when he was stationed on the USS Shrike, he and an individual named "Glenn Burton" had the authority to order materials for the ship; that the Shrike "received numerous items that he did not order," and that there was an instance when "a large shipment of supply was awaiting him when the Shrike had returned from an exercise in San Diego" and that he was "told to 'get rid of' them"; that he "removed some of those items and placed some into the dumpster"; and that he had spoken to an individual named "Dawson" about

---

[5]The Interview Report, provided to defense counsel on February 12, 2008, is attached as Exhibit C.

"purchasing some of the items that were placed into the dumpster" (*id.*);

(5) Carmel said he visited "Dawson's Recycling, Inc." and "H & H" looking for items to reuse and buy; that he knew the owner of the business and met with him several times; he "initially stated that Dawson did not sell anything to him but later advised agents he had purchased some materials from Dawson Recycling, Inc.," and that "Dawson kicked him off the property and threatened to call the police for trespassing" (*id* at 1-2);

(6) Carmel informed agents he stored the materials he purchased from Dawson's Recycling, Inc., and other sources in two storage units that he rented; that he might have also kept gun parts in the storage units; and that upon his departure from the Navy, he transported the materials back to his current residence in Gilman, Wisconsin (*id.* at 2);

(7) Carmel advised agents that he has machine gun barrels from commercial sources (*id.*);

(8) Carmel did not give agents consent to search his residence (*id.*); and,

(9) At the conclusion of the interview, Carmel was allowed a telephone call to his parents and girlfriend; "[d]uring the telephone conversation with his father, Carmel stated that he was arrested and he could probably guess why" (*id.*).

## C.    The Chippewa County Search Warrant

After his arrest, law enforcement agents obtained a search warrant from the Circuit Court of Chippewa County (Wisconsin) (the "Chippewa County Search Warrant") for Carmel's residence at 35060 225th Avenue, Gilman, Wisconsin ("Carmel Residence").

The application for the warrant was supported by an affidavit of Investigator Chad Holum of the Chippewa County Sheriff's Office ("Holum Affidavit") and an

accompanying statement of probable cause ("Probable Cause Statement").[6]  In his affidavit,

Investigator Holum asserted that he had reason to believe that the following items were located

at the Carmel Residence: "[t]hree machine guns identified as a Rheinmetall MG3, a MG 34 & a

Heckler & Kock HK21 as well as any machine gun parts or any items capable of use to modify a

weapon into a machine gun".  (Holum Affidavit, Exh. D, page 1).  The Holum Affidavit further

sets forth that these "things may constitute evidence of a crime, to-wit: Illegal Possession of

Machine Gun contrary to sec. 941.26(1)(a), & sec. 941.27(1)(a) & (b) of the Wisconsin

Statutes." (*Id.*)

      The request to search was based in part on information obtained from a recorded

telephone conversation between Carmel and the UC on May 22, 2007 during which Carmel

spoke about weapons he kept at his residence; agents' observation of weapons-related material in

Carmel's vehicle at the time of the arrest; and certain post-arrest statements made by Carmel.

The justification for the search warrant, set forth in greater detail in the Probable Cause

Statement, included the following:

      (1) On May 22, 2007, an undercover ICE agent, in New York, contacted David

Carmel, in Gilman, Wisconsin, by telephone to arrange a meeting. (*See* Probable Cause

Statement, Exh. D, page 2).  Through this and subsequent telephone calls, the meeting was

arranged at a location in Chippewa Falls, Wisconsin, on May 30, 2007 at 1:45 p.m. (*Id.*).  During

these conversations, Carmel "invited the UC to his property to shoot." (*Id.*).  In response to the

UC's question about what type of weapons Carmel possessed, Carmel "stated he owned three

---

     [6] The Chippewa County Search Warrant and the accompanying Holum Affidavit and
Probable Cause Statement are attached as Exhibit D.

weapons identified as a Rheinmetall MG3, a MG 34 & a Heckler & Kock HK21." (*Id.*).  In addition, "Carmel stated that whatever ammunition the UC would bring, he would have a weapon to shoot it" (*id.*) and there was "discussion about night-vision equipment" (*id.*).

(2) At 1:30 p.m., on May 30, 2005, Carmel was stopped while driving his car and was arrested on the Complaint.[7]  During a search of his vehicle incident to the arrest, the arresting officers "located [] two top handles made for a M16 machine gun." (*Id.*).  "These handles contained a portion of the functional part of a M16 machine gun.  Based upon his training experience in the Marine Corp[s] and in law enforcement, the affiant states that without this part, the M16 would be unable to function unless the weapon has been altered in some manner." (*Id.*).

(3) During his post-arrest interview, Carmel "stated that he possessed one machine gun, MG M-119, and stated he possessed a license for this weapon from the ATF." (*Id.*). Carmel refused to answer any questions regarding other types of machine guns. (*Id.*).  In addition, Carmel stated: that "he has in a storage shed pieces of tanks, bullet shells, and machines"; that "when he discharged from the military he had transported gun barrels & ammunition to Wisconsin"; and that "he had machine gun barrels which he had purchased from commercial sources." (*Id.*).  During a phone conversation with his father, Carmel told his father "that the feds had arrested him, and that his father could guess what for." (*Id.*).

Chippewa County Circuit Court Commissioner Robert McKinley signed the search warrant at 7:25 p.m. on May 30, 2007.  Agents proceeded to execute the search of the

_____

[7]The fact that the arrest was made subsequent to a stop pursuant to a traffic violation (even though agents already had the Southern District arrest warrant on the Iadovito Complaint) is not set forth in the Probable Cause Statement.

Carmel Residence that evening and into the next day.

### D.    The Federal Search Warrant

On May 31, 2007, after commencing the search of the Carmel Residence pursuant to the Chippewa County Search Warrant, the Government sought a broader search warrant from the United States District Court for the Western District of Wisconsin ("Federal Search Warrant") supported by an Affidavit by Special Agent Liane Sellner of the ATF ("Sellner Affidavit") and the Iadovito Complaint.  (The Sellner Affidavit, in turn, sets out the salient points from the Holum Affidavit which had been submitted in connection with the Chippewa County Search Warrant (Sellner Affidavit at ¶7a-d)).[8]  As set forth in greater detail in the Sellner Affidavit, once agents entered the Carmel Residence to execute the Chippewa County Search Warrant, they observed a large number of weapons and related items beyond the scope authorized by that warrant.  Special Agent Sellner, who has been an ATF agent since September 2003, set forth in her affidavit that, based on the information in the Iadovito Complaint, as well as conversations with Special Agents Kai Wah Chan of ICE and Lori Iadovito of DCIS, Investigator Holum, and other law enforcement agents, she "believe[s] that now located at the [Carmel Residence] ... are the fruits, evidence, and instrumentality of criminal offenses against the United States related to the unlawful possession and sale of firearms, explosives and other government property in violation of federal law, including but not limited to firearms and explosives statutes, further described in Attachment B." (Sellner Aff. ¶4).

As set forth in greater detail in the Sellner Affidavit, the following, among other things, form the bases for this belief:

---

[8]The Federal Search Warrant and the Sellner Affidavit are attached as Exhibit E.

(1) On May 30, 2007, after being notified by Investigator Holum[9] that the state warrant had been signed, officers entered the main building of the Carmel Residence (Sellner Aff. ¶9). Approximately ten minutes after entering, one of the searching officers advised Investigator Holum by telephone that "they had observed a large amount of weapon[] [*sic*] ... [including] several rifles, hand guns, and a shoulder rocket launcher ... a silencer attached to rifles and hand guns and a silencer not attached to any firearm." (*Id.*). The officer also "observed optical [devices] that matched the description of the optics described by the federal agents" during a pre-arrest briefing during which federal agents "discussed optics stolen by Carmel". (*Id.*).

(2) Special Agent Chan of ICE entered a large storage building on the property where he "observed numerous pelican cases with the marking[s] AN/PEQ-2A as well as AN/PAQ-4C on the cases." (Sellner Aff. ¶10). Based on Special Agent Chan's training and experience, "these markings are known to be infrared laser-aiming devices manufactured by Insight Technology, [Inc.], for the U.S. Military and approved Law Enforcement agencies, and consistent with those that Carmel was alleged to have sold to an undercover officer as set forth" in the Iadovito Complaint. (*Id.*). In addition, Special Agent Iadovito from DCIS "observed the above mentioned units in the basement of the main residence along with other yet to be identified optical devices." (*Id.*).

(3) An ATF agent, also present, "observed numerous firearms, some of which had selector switches consistent with fully automatic weapons." (*Id.* ¶11). The ATF agent tested 40 weapons "to see if any had been modified with parts capable of use to modify a weapon into a

_____

[9]Note that the Sellner Affidavit occasionally refers to Investigator Holum as "Holman."

machine gun and .... determined that 30 of these weapons functioned in a manner consistent with fully automatic weapons." (*Id.*). The Sellner Affidavit further noted that "[b]ased on statements Carmel made to the ATF agent, he only possessed a license for one fully automatic weapon." (*Id.*).

(4) On May 31, 2007, photographs taken of items at the Carmel Residence pursuant to the search the day before were shown to explosives experts. (*Id.* ¶12a). These explosives experts observed "approximately (20) 40mm grenades" which "appear from the photos to be active." (*Id.*). However, the Affidavit notes that "only closer inspection would reveal if these items are live." (*Id.*). If live, "these items are considered destructive devices, and are illegal to possess unless registered." (*Id.*). The photos also showed a number of "items ... of a military nature", including a Rocket Propelled Grenade (RPG) mounted to a launcher along with a launcher, potentially live (*id.* ¶12b); "numerous artillery projectiles", potentially live (*id.* ¶12c); "several other 40 mm target rounds which typically contain explosives and are considered to be destructive devices and illegal to possess" (*id.*); and "ammunition cans which were marked with the word 'explosives', three large machine guns commonly referred to as chain guns ..., and two 81mm mortar tubes. ..." (*id.*).

(5) Pursuant to a check of the National Firearms Registration and Transfer Records, it was determined that Carmel had the following weapons registered to him: "[o]ne ... model M11, 9mm machine gun ..."; "one model M203, 40mm destructive device[](underbarrel grenade launcher) ..."; "one 9mm silencer ..."; "one .22 caliber silencer ..."; and "one ... model M4-96D, 5.56mm suppressor ..." (*Id.* ¶13). Carmel's application indicated that he had manufactured some of these devices. (*Id.*). The affidavit noted that "[c]loser examination is

necessary to determine whether these items were manufactured using stolen government property." (*Id.*).

The Sellner Affidavit sought permission to search and seize Carmel's computer equipment and related items based on the information in the Iadovito Complaint that Carmel "used the internet to sell government property" (*id.* ¶14); in adition, Attachment B consisted of a list of items believed to be at the Carmel Residence based on the information in the Sellner Affidavit, including, among other things, "[m]achine guns [and] machine gun parts" including certain enumerated items "and tools used in the manufacture of machine guns or other firearms or explosive devices" (Sellner Aff., Attachment B, ¶1); "[s]ilencers [and] components used in the manufacture of silencer[s]" including certain enumerated items (*id.* ¶2); literature and manuals and diagrams related to the manufacture and production of silencers, machine guns, and explosives (*id.* ¶¶ 3,5); explosives and related items, RPGs, and launchers, and artillery projectiles (*id.* ¶¶ 4, 7, 8); "[a]ny other items that appear to be military equipment available through armed services supply depots" (*id.* ¶9); and all documents and records related to the "sale, purchase, barter or manufacture of firearms, explosives, and any other military equipment" including computer-related items (*id.* ¶10).

Magistrate Judge Stephen L. Crocker of the Western District of Wisconsin signed this warrant on May 31, 2007, at 4:20 p.m.

Consistent with Fed. R. Crim. P. 41(f), the agents left a search warrant inventory, consisting of a 47-page handwritten chart, at the Carmel Residence.[10]  The first 15 pages contain

---

[10]A copy of this inventory is attached as Exhibit F.  It was provided to defense counsel on February 12, 2008, with Bates stamp numbers 100 - 147.

the following information: (1) an item number; (2) a brief detailed description of the item seized, including a serial number where available; (3) the location of the seizure; and (4) the individual who found the item.[11]  The rest of the inventory is "31 pages" of items from "Machine shop building E" (Exh. F, Bates stamp #116) that lists the item number and, as the description,  more general weapons and weapons-related references.[12]

**F.    The Western District of Wisconsin Criminal Case**

    1.    The Charges

        Based on the items obtained during the search at the Carmel Residence, the defendant was charged in the Western District of Wisconsin in a complaint dated June 4, 2007 with knowingly and unlawfully possessing two machine guns in violation of Title 18, United States Code, Section 922 (o).  He was indicted on June 7, 2007 and charged with possession of sixty machine guns, as defined in 26 U.S.C. §§ 5845(a) and (b), including an MG 34 machine gun and an HK 21 machine gun, that were not registered to him in the National Firearms and Transfer Record, in violation of Title 26, United States Code, Section 5861(d) ("Wisconsin

---

[11]Some examples of entries on these pages include the following: "Machine Gun with tripod 56T421C" located on the "I-Floor" found by "Siegler/DCIS" (Exh. F, Bates stamp # 100); various entries listing "AN/PEQ-2A Sights" and "Night Vision Lenses" located in the "Basement" found by "K. Siegler" (Exh. F, Bates stamp # 101); "Military Gas Mask SN MSA-1294 D-115" located in the "South Bedroom" found by "Investigator Starck" (Exh. F, Bates stamp #103); "Beretta .22 cal pistol (with attached silencer), S/N A581194 " located in the "Entry Foyer (To the Right)" found by "Investigator Rick Starck" (Exh. F, Bates stamp #103); "Unk Manu, Unk Model, 9mm SN VA0070" located in the "UP m.d. north Bedroom" found by "K. Handy" (Exh. F, Bates stamp #105); "Silencer" located on the "1st Floor Porch" found by "KH" (Exh. F, Bates stamp #109).

[12]These pages include numerous itemized entries with descriptions such as "Gun barrel", "Misc Gun parts", "Box of magazines" (Exh. F, Bates stamp #117), "Tub of gun belts" (Bates stamp #128), "Ammo box" (Bates stamp #133).

Indictment"). He was arraigned on these charges in the Western District of Wisconsin on June 11, 2007.

    2.    <u>Defendant's Motions</u>

        On August 10, 2007, defendant made a number of motions in his Wisconsin case, including, *inter alia*, (1) requesting a *Franks* hearing on the grounds that Investigator Holum allegedly "intentionally or recklessly omitted two material facts" from the Chippewa County Search Warrant affidavit (*see* Order of United States Magistrate Judge Stephen L. Crocker, August 14, 2007 ("Magistrate Order") at 1); and (2) a motion to suppress evidence on the grounds that the Chippewa County Search Warrant should be quashed because it was "unsupported by probable cause, and the good faith doctrine cannot save it"[13] (*see* Report and Recommendation of United States Magistrate Judge Stephen L. Crocker, September 7, 2007 ("Magistrate Report & Recommendation") at 6).[14]

    a.    <u>Defendant's Motion for a *Franks* Hearing</u>

        United States Magistrate Judge Crocker denied defendant's motion for a *Franks* hearing in an order dated August 14, 2007. After holding a recorded telephonic hearing in which both the Government and the defense presented their arguments, and reviewing the briefing, Magistrate Judge Crocker concluded that the defendant "has not crossed the high threshold that

---

    [13]Defendant made a number of other motions, including a motion to dismiss the Wisconsin Indictment for (1) failure to charge an offense; (2) violation of due process; and (3) the charging statute is unconstitutionally vague as applied to him. Those motions were also denied.

    [14]The Magistrate Order and the Magistrate Report & Recommendation as well as the Order of U.S. District Judge John C. Shabazz of September 19, 2007 ("District Court Order") accepting the Magistrate's Report & Recommendation, are attached hereto as Exhibit G.

would entitle him to a *Franks* hearing." (Magistrate Order at 1). After reviewing the standard applied to a motion for a *Franks* hearing, the Magistrate Judge explained that Carmel challenged Investigator Holum's statements that (1) agents observed two "top handles" in Carmel's car and based on Investigator Holum's training in the Marine Corps and in law enforcement, he was aware that without the two top handles, an M 16 machine gun would be unable to function; and (2) Investigator Holum reported that Carmel reported possessing one machine gun, an MG M-119 for which Carmel stated he possessed an ATF license. (Magistrate Order at 2). Carmel maintained that these two assertions by Investigator Holum were "compromised by material omissions" (*id.*) as follows – (1) first, the M16 "has a legal cousin, the semiautomatic AR15, which accepts top handles from an M16" (*id.*); and (2) Carmel's MG M-119 was licensed (*id.*). Carmel contended in his motion for a *Franks* hearing that "[h]ad Investigator Holum reported these facts, they would have undermined the probable cause for the warrant." (*Id.* at 2.).

    In his order denying the *Franks* hearing, Magistrate Crocker "agree[s] with Carmel that it would be material for the court to know that top handles for illegal M16s can be used on legal AR 15s, but Carmel has not made a substantial preliminary showing that Investigator Holum actually knew this or that he intentionally or recklessly failed to include this information in his affidavit." (*Id.* at 2.). Although considering this "a close call" the Magistrate Judge concluded that Carmel was not entitled to a *Franks* hearing on this point. (*Id.* at 3.). The Magistrate further noted that "Carmel's second claimed omission is not a close call, " (*id.*), noting that in reporting Carmel's claim that his M-119 was registered and legal, "Investigator Holum placed material exculpatory information before the court ... [and] did not state or imply that Carmel was lying." (*Id.*). Accordingly, Carmel's motion for a *Franks* hearing was denied.

b.    Defendant's Motion to Quash the Chippewa County Search Warrant for Lack of Probable Cause

Magistrate Crocker denied defendant's motion to quash the Chippewa County Search Warrant for lack of probable cause and bad faith in a Report and Recommendation dated September 7, 2007. As noted by Magistrate Crocker, Carmel's "main point" in support of his contention that the Chippewa County Search Warrant lacked probable cause "is that when Investigator Holum listed the three weapons that Carmel told the UC he owned, Investigator Holum did not establish that these weapons were machine guns." (Magistrate Report & Recommendation at 7). His "second point is that even if we get past the first point, Holum did not address whether these weapons fell within the broad, vague statutory exception to Wisconsin's prohibition on machine guns." (*Id.*).

After outlining the standards for probable cause and of review, Magistrate Crocker extensively reviewed the facts set forth in Investigator Holum's affidavit, addressed the substance of Carmel's claims, and rejected them after careful consideration. Noting that although "[i]t would have been highly preferable for Investigator Holum to have provided foundational information in the body of his affidavit [that the three weapons were in fact machine guns], ... his statement that these weapons *were* in fact machine guns was made under oath as part of his warrant application." The Magistrate also noted that Holum referenced his "expertise in firearms." (*Id.* at 8.).[15] In addition, the Magistrate Judge reviewed the other facts in

_____

[15]Although not relying on it, the Magistrate Judge noted that a cursory internet search "puts the lie" to Carmel's implication that the MG3, MG34, and HK21 "might have legal cousins" further noting that the weapons are each "so obviously a large, powerful fully automatic weapon that anybody who knew anything about machine guns would know the nature of these weapons and would know that there were no legal analogs for people like Carmel to possess and shoot." (Magistrate Report & Recommendation at 9). At the same time, the Magistrate noted

18

the affidavit contributing to probable cause, including (1) Carmel's admission in his post-arrest

statement that he had purchased machine gun barrels, which "strongly corroborated Investigator

Holum's claim that Carmel possessed entire machine guns" (*id.* at 11); (2) the two top handles

for an M16 machine gun found in Carmel's vehicle;[16] and (3) Carmel's overheard statement to

his father "that he had been arrested and the father could guess why" by which the Magistrate

concluded Carmel "was implicitly conceding that the grounds for his arrest were so obvious that

even his father, who wasn't present on the scene, could deduce them." (*Id.* at 12.).[17]  Considering

all of these facts, the Magistrate concluded that, "although Investigator Holum left a lot of holes

and gaps in his scattershot affidavit, under the totality of circumstances, this amalgam of

evidence likely established probable cause [that] Carmel unlawfully possessed machine guns."

(*Id.*).

   The magistrate then considered Carmel's claim that Investigator Holum had not

established that the firearms were not covered by exceptions in Wisconsin's machine gun

---

that Investigator Holum apparently mistakenly referred in his affidavit to an "'MG M-119 machine gun'" which the Magistrate noted, after research, probably actually referred to "type 'M 11/9' which is the designation of SWD's 9mm. submachine gun," (*id.* at 10), taking both the investigator and the state court to task for not catching this error.

 [16]Magistrate Judge Crocker considered whether Carmel's claim in connection with his motion for a *Franks* hearing that "the M16's legal, single-shot cousin, the AR-15, also could use these top handles" (Magistrate Report & Recommendation at 11) detracted from the relevance of this fact to the determination of whether probable cause existed to believe that Carmel had machine guns at his residence.  The Magistrate agreed that this information "might have lessened the impact of the top handles but in the context of everything else reported in the affidavit, would not have negated completely their relevance: all the bits and pieces of evidence were pointing toward Carmel as a guy who had a lot of machine guns and machine gun parts lying about the premises." (Magistrate Report & Recommendation at 11).

 [17]The Magistrate expressly did not consider Carmel's refusal to answer questions about whether he had licenses for his other machine guns after stating that he had a license for his "M-119" during his post-arrest interview. (Magistrate Report & Recommendation at 12).

prohibition.  After reviewing the relevant statutory language, and noting that a literal reading of the exception would be "patently ridiculous", the magistrate determined that such inquiry was unnecessary since "[n]otwithstanding the fact that state agents applied to a state court for a state search warrant under the auspices of a state statute, in this federal court, Carmel's challenge to the constitutional reasonableness of the warrant is measured objectively against federal standards. ..." (*Id.* at 13 (citing cases).).  Based on a review of federal standards, the Magistrate determined that the application was sufficient, and "[e]ven if there isn't probable cause to support this search warrant, it is close enough to the line to be rescued by the good faith doctrine." (*Id.* at 14.).  After reviewing the relevant case law on the "good faith doctrine", the magistrate concluded that "Carmel cannot establish that ... [the] agents could not have held an objectively reasonable belief that their warrant was valid." (*Id.* at 16.).

The Magistrate's Report & Recommendation was adopted by U.S. District Court Judge John C. Shabazz in an Order dated September 19, 2007.  After reviewing the facts in the affidavits and the relevant case law, the District Court stated that it "agrees with the Magistrate Judge's finding that Investigator Holum's affidavit was sufficient to support probable cause for the search of defendant's residence" and that "the search warrant of defendant's premises could also be upheld on good faith grounds." (District Court Order at 5).

3.    Guilty Plea and Sentence

Carmel entered a guilty plea on September 18, 2007 to the Wisconsin Indictment pursuant to a plea agreement with the United States Attorney's Office for the Western District of Wisconsin ("Plea Agreement").[18]  The plea was entered prior to the District Court's ruling on

---

[18]The Wisconsin Plea Agreement is attached as Exhibit H.

defendant's motions to suppress evidence and dismiss the Wisconsin Indictment. Pursuant to the plea agreement, the defendant reserved his right to appeal adverse determinations on either motion.[19] The defendant was sentenced on November 27, 2007 to 46 months' imprisonment to be followed by a three-year term of supervised release.

Carmel filed a notice of appeal with the United States Court of Appeals for the Seventh Circuit on or about December 3, 2007. His appeal is currently pending. Carmel was transported to the Southern District of New York pursuant to a writ, arriving on or about January 31, 2008, to face the charges pending in this District.

## ARGUMENT

## I.

### THE GOVERNMENT CONSENTS TO A HEARING ON DEFENDANT'S *MIRANDA* CLAIM[20]

Before the Government may introduce a defendant's incriminating statement, it must prove that the accused voluntarily, knowingly, and intelligently waived his or her *Miranda* rights. *Miranda v. Arizona*, 384 U.S. at 474. *Miranda* protections attach only when a suspect is both in custody and subject to interrogation. *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). Once a defendant who is in custody and subject to interrogation invokes the right to remain silent or

---

[19]In addition, the defendant agreed to forfeit "those unregistered firearms that were illegal for him to possess prior to indictment, including, but not limited to, machine guns and silencers" that were seized. (Plea Agreement ¶8). The Government "agree[d] to recommend that all property seized by ATF or other law enforcement authorities which the defendant legally possessed prior to the indictment will be returned to a person or persons designated by the defendant and legally able to possess the property ...." (*Id.*).

[20]The defendant did not make this claim, or present any other challenge to the admissibility of his post-arrest statement, in the Western District of Wisconsin.

the right to counsel, the police must then cease all questioning. *Id.* at 475; *see Anderson v. Smith*, 751 F.2d 96, 101-02 (2nd Cir. 1984) (continued questioning by officer after repeated *Miranda* invocation violated *Miranda*).  After a defendant makes a clear and unequivocal request for counsel, law enforcement officials must then cease interrogation until counsel is obtained, unless the suspect subsequently waives the right. *Miranda*, 384 U.S. at 444-45; *Davis v. United States*, 512 U.S. 452, 458-59 (1994) (suspect's request for counsel must be clear enough to alert a reasonable police officer under the circumstances that the suspect is requesting an attorney).  The Government must prove waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).  To prove a valid waiver, the Government must show that (1) the waiver was voluntary, that is, it represented an "uncoerced choice," and (2) that the defendant understood both the nature of the right being waived and the consequences of the waiver. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Here, there is no question that Carmel was advised of his *Miranda* rights after being placed under arrest and that he understood those rights.  Rather, Carmel's argument is that he invoked his rights to remain silent and for a lawyer. (Affidavit of David Carmel ("Carmel Aff.") ¶2 ("[W]hile being read my *Miranda* rights ..., I invoked my right to remain silent and I asked for a lawyer.")).

Carmel's affidavit raises a material dispute of facts.  Accordingly, the Government consents to a hearing on Carmel's motion to suppress his post-arrest statement.  At such a hearing, the Government is prepared to prove through the testimony of law enforcement witnesses that Carmel knowingly waived his right to counsel and agreed to speak with law

22

enforcement.[21]

## II.

**CARMEL'S SUPPRESSION MOTION SHOULD BE DENIED BECAUSE
THE SEARCH WARRANT AFFIDAVITS READILY ESTABLISHED
PROBABLE CAUSE TO BELIEVE THAT EVIDENCE
OF ILLEGAL WEAPONS WOULD BE FOUND IN THE CARMEL RESIDENCE,
AND BECAUSE, IN ANY EVENT, THE SEIZING AGENTS RELIED IN
<u>GOOD FAITH ON THE VALIDITY OF THE WARRANTS</u>**

Carmel argues that both the state and the federal search warrants failed to establish probable cause to support the requested search. With regard to the Holum Affidavit and accompanying Probable Cause Statement submitted in support of the Chippewa County Search Warrant, Carmel points to the following alleged deficiencies: (1) that there is no "information establishing a basis for believing that the weapons [listed in the Probable Cause Statement, including a Rheinmetall MG3, a MG34 & a Heckler & Kock HK21] were, in fact, machine guns" (Def. Br. at 15); (2) that there is no information regarding whether the weapons fall into any exceptions to Wisconsin or federal firearms statutes (*id.* at 16); and (3) that there is no discussion of whether the reference to "two top handles made for an M16 machine gun" refers to illegal items with possible legal application (*id.* at 17).

Carmel argues that the Federal Search Warrant failed to establish probable cause as well,

---

[21]Carmel also claims that he was denied "access to medication prescribed to him by his psychiatrist." (Def. Br. at 10.). Although this allegation is mentioned in both his affidavit and in his moving papers, it is unclear whether he is claiming that this was also a violation of his constitutional rights.

pointing the following alleged deficiencies: (1) the "information in the complaint[22] was stale" (Def. Br. at 19); (2) the Warrant application was "based on inaccurate representations in the federal complaint and in [Special Agent] Sellner's affidavit", including that Carmel was a "supply officer" on the Shrike who had been relieved of those duties for misappropriating government property (*id.* at 20); and (3) the evidence obtained during the execution of the Federal Search Warrant should be suppressed as "'the indirect fruits'" of the illegal state search warrant (*id.* at 21 (citation omitted)).

Under applicable legal standards, both affidavits set forth ample probable cause to justify the search of the Carmel Residence for evidence of illegal weapons and, with regard to the Federal Search Warrant, for stolen government property.  In any event, even if this Court were to conclude that either affidavit lacked an adequate showing of probable cause (which it should not), the agents were entitled to rely on the Chippewa County Court Commissioner and federal Magistrate Judge's decisions to issue the warrants.

## A.    The Applicable Law:  "Probable Cause" Standards

The Fourth Amendment provides that search warrants shall not be issued, except "upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV.  The legal standard for determining whether a particular search warrant application is supported by probable cause is well established.  "The task of the issuing magistrate is simply to make a practical, common-sense decision whether given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a

---

[22]This appears to refer to the Iadovito Complaint, which was attached as an exhibit to the Sellner Affidavit, which provided the basis for the probable cause for the Federal Search Warrant.

particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Such determinations must be approached in a practical way, *id.* at 232, because "probable cause is a flexible common-sense standard," *Texas v. Brown*, 460 U.S. 730, 742 (1983). "The process does not deal with hard certainties, but with probabilities .... [T]he evidence ... must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Illinois v. Gates*, 462 U.S. at 231-32 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981) (internal quotation marks omitted)).

The probable cause standard does not imply "more probable than not." *United States v. Travisano*, 724 F.2d 341, 346 (2nd Cir. 1983). Rather, a "probability, and not a *prima facie* showing, of criminal activity is the standard of probable cause." *Spinelli v. United States*, 393 U.S. 410, 419 (1969). As the Second Circuit recognized in *Travisano*, a "more probable than not" standard would be unworkable in circumstances where, for example, a guilty party had more than one location available to secrete the evidence of a crime. 724 F.2d at 346. The court went on to state, "[n]or must the standard used by a reviewing court be so stringent, technical or grudging as to discourage the use of search warrants." *Id.* Probable cause does not require that law enforcement officers "exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence." *United States v. Dale*, 991 F.2d 819, 844 (D.C. Cir. 1993). A judge evaluating the adequacy of a search warrant application may consider hearsay in determining the existence of probable cause. *See, e.g.*, *Jones v. United States*, 362 U.S. 257, 269-71 (1960); *United States v. Smith*, 9 F.3d 1007, 1013 (2nd Cir. 1993).

A lower court's determination of the existence of probable cause "deserves 'great deference,'" and the duty of a court reviewing a lower court's probable cause determination is

25

"simply to ensure that the magistrate had a substantial basis for ... conclud[ing] that probable cause existed." *Illinois v. Gates*, 462 U.S. at 238-39 (internal quotations omitted); *accord United States v. Rosa*, 11 F.3d 315, 326 (2nd Cir. 1993); *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991); *see also United States v. Rowell*, 903 F.2d 899, 902 (2nd Cir. 1990) (search warrant "will be upheld so long as there was 'a "substantial basis for ... conclud[ing]" that a search warrant would uncover evidence of wrongdoing.'") (quoting *Illinois v. Gates*).  Once a neutral and detached magistrate issues a search warrant based on a finding of probable cause, "doubts should be resolved in favor of upholding the warrant." *Travisano*, 724 F.2d at 345.

For the reasons set forth below, the Government respectfully submits that the probable cause findings of the court commissioner who issued the Chippewa County Search Warrant — which was upheld by the federal magistrate judge, who in turn was upheld by a federal district court judge, of the Western District of Wisconsin[23] — as well as the Federal

---

[23]The Government submits that the decisions by the federal magistrate and district judges in Wisconsin upholding the Chippewa County Search Warrant should be given great weight by this Court as those judges undertook a thorough, balanced, and careful review of the law and facts in rejecting Carmel's identical claims.  However, the Government does not argue that Carmel is precluded from relitigating the same suppression claim in this district.  Although the law is unsettled, it is possible that in certain cases, the doctrine of collateral estoppel/issue preclusion might preclude a defendant from relitigating suppression in one district after losing on the identical claim in a different district. *See, e.g.,* 6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.2(g) (4th ed. 2004) ("Although the doctrine of collateral estoppel as to the facts determined at the trial of criminal cases does not run both ways, this does not bar application of a collateral estoppel rule [in a context where defendant was denied suppression in a prior case and is seeking to relitigate the issue in a different case].") (citing mostly state cases).  Here, collateral estoppel would not apply even if it were clear that it could preclude relitigation, because the suppression issue is still on appeal in the Seventh Circuit, and therefore the suppression decision of the Western District of Wisconsin is not final. *See, e.g., United States v. Cheung Kin Ping*, 555 F.2d 1069, 1076 (2nd Cir. 1977) (declining to reach "novel issue" of whether trial judge properly applied doctrine of collateral estoppel against a criminal defendant because defendant won reversal of conviction on appeal in other circuit and so "the doctrine of collateral estoppel would not have precluded [appellant] from relitigating his

Search Warrant issued by the federal magistrate judge were both amply supported by both the facts and the law.  Both Court Commissioner McKinley and Magistrate Judge Crocker plainly each had a "substantial basis" for issuing the Chippewa County Search Warrant and the Federal Search Warrant, respectively.  Moreover, even if this Court were to conclude otherwise, the Government nevertheless submits that the evidence at issue here is admissible because the investigating agents relied in good faith on the warrants issued by both the court commissioner and the magistrate judge.

**B.**    <u>**The Chippewa County Search Warrant Was Supported By Probable Cause**</u>

The defendant argues that the Chippewa County search warrant application alleged insufficient facts making it probable that the defendant possessed unregistered weapons – the same argument he made and lost before the Magistrate Judge and District Court Judge in the Western District of Wisconsin – and requests that this Court reach a different conclusion than that reached by the Court Commissioner who granted the warrant as well as both the federal magistrate and district court judges who upheld it in the face of similar challenges.  The defendant's contention that there is nothing in the Probable Cause Statement to support a finding that the three weapons identified by Investigator Holum were machine guns or that they were illegal, and that there is nothing else in the warrant to establish probable cause, is without merit and should be rejected by this Court, the same conclusion reached by the two previous federal judges who considered these same arguments.  Considering the totality of the circumstance, and affording great deference to the issuing judge's conclusion, there is ample evidence to determine that, based on the Holum Affidavit and the Probable Cause Statement, there was a "fair

claims").

27

probability that contraband or evidence of a crime would be found in a particular place" — in this case, that illegal weapons, namely, unregistered machine guns, would be found at the Carmel Residence.

The Probable Cause Statement and the Holum Affidavit set out that Carmel had discussed possessing three machine guns during his conversation with the UC on May 22, 2007 — barely a week before the warrant was issued. Carmel's argument that the Chippewa County Search Warrant application nevertheless was deficient because it fails to assert that these weapons were in fact machine guns was carefully considered and rejected by Magistrate Judge Crocker. Carmel's protestations notwithstanding, Investigator Holum stated under oath that the weapons likely were in fact machine guns, a conclusion based in part on his expertise in this area gained from his experience in the military and law enforcement. Judge Crocker rightly noted that the Court Commissioner was entitled to rely on these assertions in determining whether there was probable cause that machine guns would be found at the Carmel Residence. Carmel's contention that the fact that the application for the warrant does not explain that the "two top handles" observed in Carmel's vehicle could also be used for a legal version of the illegal M-116 also should be rejected; as Magistrate Crocker noted, although the fact that they *could be* used on another type of weapon might have been material for the court to know, there is no suggestion that Investigator Holum actually knew this. In addition, this fact does not itself detract from the relevance of Investigator Holum's assertion that they could be used with the M-116 or the Court Commissioner's reliance on that information. Finally, the Magistrate Judge also carefully and thoroughly considered the defendant's argument, also repeated here, that even if it were established that the weapons were machine guns, there is nothing in the search warrant

28

application to suggest that their possession was illegal under the relevant state law; the Magistrate discounted this contention too, noting that federal, not state standards apply, and the search warrant was valid regardless of whether any state exception might be relevant. In any event, at best this exception is most accurately described as an affirmative defense for the crime of possessing a machine gun. In determining probable cause, the court is not required to consider every possible defense to an alleged violation, *cf., Dale*, 991 F.2d at 844 (probable cause does not require that officers "exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence"); this is particularly true given the substantial information provided in the application suggesting that the defendant had a number of weapons at his residence and was in the business of selling stolen military equipment.

As Magistrate Crocker correctly concluded, the issuing court had ample basis to determine that the search warrant application set forth probable cause to believe that illegal machine guns and related items would be found at the Carmel Residence, based on the following: (1) the defendant's statement to the UC that the defendant had three weapons, described by the defendant by name and identified by Investigator Holum, based on his law enforcement and military experience, as machine guns; (2) the defendant's invitation to the UC to shoot at the defendant's property; (3) the defendant's statement to the UC that whatever ammunition the UC would bring, the defendant would have a weapon to shoot it; (4) the top handles found in defendant's vehicle, described by Investigator Holum as necessary to cause a firearm to function as a particular type of machine gun; and (5) the defendant's overheard statement to his father, after his arrest, that his father could guess why he had been arrested. These factors, alone, would be sufficient to establish probable cause. In addition, the Court has

29

before it the defendant's post-arrest statements that he had machine gun barrels and one registered machine gun, which add to the probable cause analysis.[24]  Moreover the defendant told the UC that he had three specific machine guns, and in his post-arrest statement mentioned a license for one machine gun, leaving at least two in the defendant's possession potentially unregistered.[25]  The Court Commissioner properly determined, after applying his common sense and experience to these facts, that there was ample probable cause established to believe that the defendant possessed unregistered weapons at his residence.

Looking at the totality of the circumstances presented by the state search warrant application, including the Holum Affidavit and the accompanying Probable Cause Statement, and giving due deference to the conclusions of the issuing officer as well as to the common sense standards by which probable cause is to be judged, and the assessments of the reviewing Magistrate Judge and District Court Judge who have already ruled upon this question, this Court should uphold the validity of the Chippewa County Search Warrant.

## C.    The Federal Search Warrant Was Supported By Probable Cause

The defendant's challenges to the Federal Search Warrant are similarly without merit.[26]  Agent Sellner's affidavit amply sets out probable cause to determine that military

---

[24]Since probable cause is established independent of defendant's statement, the Court does not need to decide the *Miranda* challenge to his post-arrest statement in order to resolve the probable cause question.

[25]The Court Commissioner was entitled to rely on the defendant's statement that he had a license for one machine gun, and could conclude from this statement that the other two were potentially unlicensed without drawing any improper inference from the defendant's silence when he was asked about additional machine guns.

[26]The defendant did not present these or any other independent challenges to the Federal Search Warrant in the Western District of Wisconsin.

equipment, weapons, and other items enumerated in Attachment B to the Sellner Affidavit would be found at the Carmel Residence based on the observations of the agents executing the Chippewa County Search Warrant as well as the Iadovito Complaint and the facts set forth in the Holum Affidavit and Probable Cause Statement.[27]  As laid out above, these collectively set forth the following at a minimum: (1) that the defendant, formerly in the military, was being investigated for stealing government property, including weapons-related items; (2) that the defendant had sold weapons-related items, including some he was suspected of stealing from the government, to a UC; (3) that the defendant had told the UC in a telephone conversation approximately a week earlier that he possessed three machine guns, giving their names, and that whatever ammunition the UC brought the defendant would have a weapon to shoot it at his residence; (4) that the defendant had admitted in a post-arrest interview to possessing machine gun barrels and other weapons-related items and had stated he had a license for one machine gun; (5) that two top handles used with a machine gun were found in defendant's car at the time of arrest; and (6) that numerous weapons, including automatic weapons, RPGs, launchers, and other weapons-related items, were found at the defendant's residence.

       Defendant's first contention is that the information relied upon was "stale".  The facts set forth in an affidavit submitted in connection with a search warrant application "must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so

---

[27]Notably, the Federal Search Warrant was sought precisely because the agents, upon executing the Chippewa County Search Warrant, observed weapons and weapons-related items far beyond the three machine guns listed in the state search warrant. *See, e.g.,* Sellner Affidavit, ¶9 (noting that Investigator Holum was advised by officers executing the Chippewa County Search Warrant "approximately ten minutes" after they entered the Carmel Residence, that "they had observed a large amount of weapon[s] and[] were going to wait until [Holum] and federal agents arrived.").

that probable cause can be said to exist as of the time of the search and not simply as of some time in the past." *United States v. Wagner*, 989 F.2d 69, 75 (2nd Cir. 1993) (citations omitted). Defendant's claim of "staleness" is belied by the facts.  In support of this contention, defendant particularly notes that "[a]ccording to the complaint, [Carmel] had not sold a PEQ to the [UC] since January 30, 2007." (Def. Br. at 19).  He further continues, "[n]either the complaint nor the [Sellner Affidavit] provided probable cause to believe that PEQs stolen from the [DOD] would be found on [Carmel's] property approximately four months after the last sale." (*Id.*).  However, as defendant himself acknowledges, during the execution of the state court warrant — a day earlier —  Special Agent Chan of ICE, as recounted in the Sellner Affidavit, "observed numerous pelican cases with the marking[s] AN/PEQ-2A as well as AN/PAQ-4C on the cases." (Sellner Aff. ¶10).  Based on Special Agent Chan's training and experience, "these markings are known to be infrared laser-aiming devices manufactured by Insight Technology, [Inc.], for the U.S. Military and approved Law Enforcement agencies, and consistent with those that Carmel was alleged to have sold to an undercover officer as set forth" in the Iadovito Complaint. (*Id.*) Special Agent Iadovito from DCIS "observed the above mentioned units in the basement of the main residence along with other yet to be identified optical devices," (*id.*), and a Chippewa County police officer, "[d]uring his time in the residence, observed optical [devices] that matched the description of the optics described" by federal agents as "optics stolen by Carmel" in a pre-search briefing (*id.* ¶9).

> Defendant, inexplicably ignoring these observations made by three law enforcement officers during the initial search, argues that "[t]he affidavit does not say that agents observed PEQs during the execution of the state court warrant," in an apparent effort to bolster

his claim that the information in the Sellner Affidavit was "stale". (Def. Br. at 19). However, defendant's point is simply irrelevant — there is simply no requirement that agents open the boxes containing what was consistent with their experience as the markings of PEQs and actually find PEQs — for there to be sufficient basis to determine there was probable cause to believe there would be PEQs at the Carmel Residence; such a requirement, that the items sought actually be found for there to be probable cause to believe they may be present there, would render the "probable cause" standard an absurd tautology.[28] The defendant's multiple sales of PEQs and other items to a UC over the course of eight months, between May 1, 2006, and January 30, 2007, plus two agents' observations of PEQ markings on boxes in the defendant's residence on May 30, 2007, and a third agent's observation of similar devices, is more than sufficient to support a finding of probable cause that there would be PEQs at defendant's residence on May 31, 2007.

    Beyond his "staleness" argument, the defendant further claims that nothing in the Sellner Affidavit "provided probable cause to believe that [Carmel], either in the past or close in time to the issuance of the warrant, had stolen a PEQ from the [DOD]." (Def. Br. at 20). This is also contradicted by the facts set forth in the Iadovito Complaint which was incorporated into the Sellner Affidavit and attached as an exhibit. (*See, e.g.,* Iadovito Complaint ¶3a ("A PEQ is manufactured by Insight Technology, Inc. ... for military and law enforcement use only."); *Id.* ¶5

---

  [28]Defendant's implication here is particularly problematic in that he appears to suggest that the agents should have opened these boxes when they saw them and have found PEQs first before applying for the broader search warrant — despite the fact that they did not at the time have either a warrant or consent to search these boxes — rather than follow prudence and correct procedure as they did: Once they observed such items and others in the course of executing the Chippewa County Search Warrant, they sought a broader search warrant based on these observations and other information before proceeding with any search or seizure of those or other boxes not authorized by the state warrant.

(noting Carmel's statements in recorded conversation with [the] UC that he had "some laser sighting stuff ... various night vision things", that PEQs were "never, ever, ever, ever, ever sold on the civilian market to anyone ..." and "[k]eep it to yourself.  Federal government does not want you to have that."); *Id.* ¶¶ 7-9 (detailing Carmel's sales to the UC of PEQs sold to the military by Insight Technology, and other weapons-related items); *Id.* ¶6 (setting forth, based on information from military records and Carmel's supervisor, that Carmel was a supply officer on the USS Shrike and had been relieved of his duties as supply officer "for misappropriating government property and misuse of his authority.").

Carmel asserts that the Sellner Affidavit is "misleading in stating ... that PEQs 'are not available in the civilian market'" (Def. Br. at 20), contending that this "is contradicted by an earlier sentence in the same paragraph that says PEQs are 'manufactured by Insight Technology, INC. for the US Military and approved Law Enforcement agencies ...." (*Id.* at 20-21.).  The Government sees no contradiction: PEQs are available only to the military and approved law enforcement, and are not available in the civilian — that is the non-military/non-law enforcement — market.  Carmel further contends that "no law prevents law enforcement agencies from disposing of or selling PEQs to other civilian agencies or civilians." (*Id.*).  This is inaccurate.  On May 22, 2008, the Government provided defendant with a redacted sample agreement between Insight and a law enforcement agency customer entitled "IR Product Disclosure Agreement"[29] which specifically states that the PEQ, among other items, is "regulated by the FDA (Food and Drug Administration)" and  "[s]ale of laser aiming lights is restricted to government, military, and law enforcement agencies under a direct purchase order from the

---

[29]This document is attached as Exhibit I.  The document is redacted for Rule 16 purposes to limit dissemination of the identity of the purchasing agency.

agency, and *shall not be sold or transferred to individual law enforcement or civilian personnel*.

Use of this product is restricted to approved agencies. It is understood that it is the purchasing

agency's responsibility to monitor possession of this equipment, and that it will be disabled,

destroyed, or returned to the manufacturer in the event that the agency's need for the equipment

expires." (Exh. I (italics added). Carmel also contends in his brief that he was "never a 'supply

officer' on the USS Shrike" and that he "was not 'relieved of his duties as supply officer for

misappropriating government property and mis[use] of his authority' as falsely stated in [the]

complaint". (Def. Br. at 20). As set forth in the Iadovito Complaint, this information is based on

military records and information from Carmel's supervisor.[30]

       Finally, the defendant's argument that the evidence obtained during the execution

of the Federal Search Warrant should be suppressed as "'the indirect fruits of an illegal search'"

as it "would not have been sought if not for observations made during the execution of the

Chippewa County Search Warrant" should be rejected. (Def. Br. at 21) (citation omitted).

Because, as noted above, there was ample probable cause to support the Chippewa County

---

[30]Carmel demands that the Government "be required to produce any documentation which it relied upon in making these inaccurate assertions." (Def. Br. at 20). The Complaint itself provides one basis — the information that he was relieved of the position of ordering supplies because he misused the position came from his supervisor on the Shrike. (Iadovito Complaint, ¶6). As noted above, it is permissible to rely on hearsay in determining whether probable cause exists. *See, e.g, Jones v. United States*, 362 U.S. at 269-71; *United States v. Smith*, 9 F.3d at 1013. Moreover, the Government via its Rule 16 obligations provided the defendant on February 12, 2008, with the computerized order records from the Defense Reutilization Management Office ("DRMO") which show that Carmel's military email address was listed as the requestor for numerous items from the DRMO for the Shrike. In addition, in his post-arrest statement Carmel himself stated that he and another individual, Glenn Burton, "had the authority to order materials for the ship." (Exh. C at 3). Finally, the Government is well aware of that its Rule 16 obligations are ongoing and will provide any further documentation on this and any other relevant matter as it is received.

Search Warrant, this argument is baseless.[31]

For all these reasons, there was more than a sufficient basis to determine that the applications for the Chippewa County Search Warrant and the Federal Search Warrant were supported by probable cause to justify the search of the Carmel Residence.

**D.    Even if the Information Presented in the Affidavits Did Not Provide Sufficient Probable Cause and/or Was Stale, the Evidence Should Not Be Suppressed Because the Investigating Agents Relied in Good Faith on the Warrants**[32]

The Supreme Court has recognized that evidence seized in violation of the Fourth Amendment's strictures need not necessarily be excluded. *See Arizona v. Evans*, 514 U.S. 1, 10 (1995) (citing *United States v. Leon*, 468 U.S. 897, 906 (1984)). This is so because "[t]he wrong condemned by the [Fourth] Amendment is fully accomplished by the unlawful search or seizure itself ... and the use of fruits of a past unlawful search or seizure work[s] no new Fourth Amendment wrong." *Arizona v. Evans*, 514 U.S. at 10 (quoting *United States v. Leon*, 468 U.S. at 906; *United States v. Calandra*, 414 U.S. 338, 354 (1974)) (internal quotation marks omitted; alterations in original).

The exclusionary rule, requiring suppression of illegally obtained evidence, is not

---

[31]Although the Government conceded in the Western District of Wisconsin litigation that it could not have obtained the Federal Search Warrant without the observations made during the course of executing the Chippewa County Search Warrant, and it is a closer call, arguably, there was sufficient information to obtain the Federal Search Warrant, even independent of those observations — including the defendant's activity involving selling weapons and weapons-related items in multiple undercover sales; the observations of weapons-related items in Carmel's vehicle at the time of the arrest; Carmel's claim to the UC that he had ammunition usable with any weapon the UC would bring; Carmel's post-arrest admission that he had weapons and related material at his house; and Carmel's overheard statement to his father regarding the fact that his father could probably guess why he had been arrested.

[32]This Court may resolve this motion on the "good faith" basis without having to reach the question of probable cause. *See United States v. Cancelmo*, 64 F.3d 804, 807-08 (2nd Cir. 1995).

mandated by the text of the Fourth Amendment, but is instead a judicially created device to deter

future Fourth Amendment violations. *Evans*, 514 U.S. at 10.  Because the exclusionary rule's

purpose is deterrence, courts have applied it only in circumstances where it is likely to curb

future transgressions. *Id.* at 10-11 (citing *United States v. Janis*, 428 U.S. 433, 454 (1976)).

Thus, it has historically been applied exclusively to police misconduct. *See Evans*, 514 U.S. at 11

("The exclusionary rule was historically designed to deter police misconduct rather than to

punish the errors of judges and magistrates.") (internal quotations and citations omitted).  Also

because the rule's function is to deter misconduct, it is not applied where police officers act in

objective and reasonable reliance on an invalid search warrant, even though their actions may

nevertheless work a Fourth Amendment violation. *Id.* at 11-12.  This is the so-called "good

faith" exception to the exclusionary rule announced by the Supreme Court in *Leon*, 468 U.S. at

919-20.  The rationale for the good faith exception is that where the officer's conduct is

objectively reasonable, exclusion does nothing to deter misconduct, and thus the "marginal or

nonexistent benefits" of suppression "cannot justify the substantial costs of exclusion." *Leon*,

468 U.S. at 922.

     The test for ascertaining whether the agents acted in good faith requires

assessment of "whether a reasonably well trained officer would have known that the search was

illegal despite the magistrate's authorization." *Id.* at 923 n.23; *see also United States v. Smith*, 9

F.3d at 1015; *United States v. Moore*, 968 F.2d 216, 222 (2nd Cir. 1992).  If the reviewing court

finds that the officers' reliance on the warrant was objectively reasonable, suppression is not

warranted. *See, e.g., United States v. Roberts*, 852 F.2d 671, 675 (2nd Cir. 1988).  "In the

ordinary case," the Supreme Court has instructed, "an officer cannot be expected to question the

magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Leon*, 468 U.S. at 921.

There is nothing to rebut the presumption of good faith in this case, either with regard to the Chippewa County Search Warrant or the Federal Search Warrant. In the former, Investigator Holum indicated in his affidavit that the three firearms specifically described by the defendant to the UC were machine guns and explained that he had expertise in machine guns, that the defendant had a license for one machine gun, and that the defendant possessed at least machine gun barrels and top handles used for machine guns. Although Investigator Holum's affidavit was short, it contained all the facts necessary for the court commissioner to find probable cause to believe the defendant illegally possessed machine guns. Based on the facts set forth by Investigator Holum (including information of an exculpatory nature), and as previously determined by the federal magistrate and district court judges who considered the defendant's argument and rejected it, there is no basis for concluding that it was not objectively reasonable, as a matter of law, for the agents to rely in good faith on the Chippewa County Search Warrant.

The same analysis and result applies to the Sellner Affidavit. As set forth above, Special Agent Sellner set forth ample probable cause in her affidavit that there were numerous weapons and weapons-related materials at the Carmel Residence, based on the observations of the agents executing the Chippewa County Search Warrant of numerous such items there, including boxes with markings consistent with PEQs; the information regarding Carmel's previous activity involving sales of weapons and weapons-related items, such as PEQs, believed to be stolen from the military, in multiple undercover sales since May 2006; the observations of weapons-related items in Carmel's vehicle at the time of his arrest; and Carmel's claim to the

38

UC that he had ammunition usable with any weapon the UC might bring.  Based on these and

other facts set forth by Special Agent Sellner, there is also no basis for concluding that it was not

objectively reasonable, as a matter of law, for the agents to rely in good faith on the Federal

Warrant.

Accordingly, even if the Court were to conclude that either search warrant lacked

probable cause, the *Leon* exception should apply and the defendant's motion to suppress should

be denied.

**E.    The Evidence Obtained Was Well Within the Scope of the Search Warrants**

Defendant contends that "all of the evidence should be suppressed because the

agents, in bad faith, engaged in a wide-ranging seizure outside the scope of the warrant." (Def.

Br. at 22).  This argument is baseless.[33]

The Federal Search Warrant authorized the seizure of a broad array of weapons

and weapons-related items believed to be found at defendant's residence, including, among other

things, "[m]achine guns [and] machine gun parts" including certain enumerated items "and tools

used in the manufacture of machine guns or other firearms or explosive devices" (Sellner Aff.,

Attachment B, ¶1); "[s]ilencers [and] components used in the manufacture of silencer[s]"

including certain enumerated items (*id.* ¶2); literature, manuals and diagrams related to the

manufacture and production of silencers, machine guns, and explosives (*id.* ¶¶3,5); explosives

and related items, RPGs, and launchers, and artillery projectiles (*id.* ¶¶4, 7, 8); "[a]ny other

items that appear to be military equipment available through armed services supply depots" (*id.*

¶9); and all documents and records related to the "sale, purchase, barter or manufacture of

---

[33]This argument was not made by the defendant in the Western District of Wisconsin.

firearms, explosives, and any other military equipment" including computer-related items (*id.* ¶10).[34]

There is no basis for defendant's implication that the agents took any items beyond the scope authorized by this warrant, and defendant does not provide any. That "[a]t least 40 state and federal agents, using forklifts and pallets, removed truck loads of items from the Carmel residence" (Def. Br. at 21), even if true, would at most simply be a reflection of the vast amount of weapons and weapons-related items present at the Carmel Residence as already indicated by the observations of law enforcement agents set forth in the Sellner Affidavit. Furthermore, as set out in the Inventory provided to the defendant by agents, the items seized fell well within the scope of the search warrant, including firearms, RPGs, ammunition, and other weapons-related items.

Moreover, assuming some factual basis to his overbreadth claim, the remedy sought by defendant – suppression of *all* fruits of the search – is inappropriate. "[T]he appropriate remedy for the seizure of materials beyond the scope of a valid warrant is the suppression of only those materials." *United States v. Regan*, 706 F. Supp. 1102, 1117 (S.D.N.Y. 1989) (citing *Andresen v. Maryland*, 427 U.S. 463, 482 n. 11 (1976); *National City Trading Corp. v. United States*, 635 F.2d 1020, 1026 (2nd Cir. 1980); *United States v. Dunloy*, 584 F.2d 6, 11 n. 4 (2nd Cir. 1978) ("the remedy with respect to any items exceeding the scope of the warrant would not have been invalidation of the search but suppression of those items")); *see United*

---

[34]Defendant seems to suggest at one point that the warrant did not authorize the seizure of the PEQs. *See* Def. Br. at 18 ("Attachment B to the federal warrant, entitled LIST OF ITEMS TO BE SEIZED, contained an extraordinarily broad range of items, but made no mention of laser sites or PEQs."). This is incorrect; the attachment references "any other items that appear to be military equipment available through armed services supply depots" which includes the PEQs.

*States v. Matias*, 836 F.2d 744, 747 (2nd Cir. 1988).  As the Second Circuit has held, "the drastic remedy of the suppression of all evidence seized is not justified unless those executing the warrant acted 'in flagrant disregard' of the warrant's terms." *Matias*, 836 F.2d at 747-48 (citing *United States v. Medlin*, 798 F.2d 407, 411 (10th Cir. 1986); *United States v. Crozier*, 777 F.2d 1376, 1381 (9th Cir. 1985); *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985); *Marvin v. United States*, 732 F.2d 669, 674-75 (8th Cir. 1984); *United States v. Wuagneux*, 683 F.2d 1343, 1354 (11th Cir.1982); *United States v. Heldt*, 668 F.2d 1238, 1259 (D.C. Cir. 1981)).

       In explicating the standard for "flagrant disregard," the Second Circuit has held that, "Government agents 'flagrantly disregard' the terms of a warrant so that wholesale suppression is required only when (1) they effect a widespread seizure of items that were not within the scope of the warrant, and (2) do not act in good faith." *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2nd Cir. 2000) (internal quotations and citations omitted).  In *Shi Yan Liu*, the Second Circuit explained that, "to satisfy the first prong of the two-part test described above, the search conducted by government agents must actually resemble a general search" such as that described in *United States v. Dzialak*, 441 F.2d 212, 217 (2nd Cir. 1971), in which law enforcement officers were described as having conducted a "general search" when, "[i]n executing what was a very precise warrant, the[y] spent more than four hours ransacking a[] house for any possible incriminating evidence," and "[o]f the items seized, those which were not described in the warrant far outnumbered those described."  In *Regan*, the court found that even if allegations that 69 of 259 boxes seized during the execution of a search warrant contained documents relating exclusively to entities entirely outside the scope of the warrant were true, that would not "show the kind of egregious, callous, reckless conduct needed to suppress all of the

evidence obtained." *Regan*, 706 F. Supp. at 1116.  The court in *Regan* noted that, "[t]his means that nearly three-quarters of all the boxes seized contain at least some documents falling within the scope of the warrant.  This degree of accuracy does not reveal the kind of flagrant disregard necessary to consider suppressing all of the evidence obtained, particularly since this percentage figure would inevitably rise if the government's definition of what legitimately falls within the scope of the warrant were used." *Id.* at 1117 n. 19.

Here, there is simply no evidence that the searching agents either conducted a general search or that they so flagrantly disregarded the terms of the warrant, and did so in bad faith, such that their conduct actually resembled a general search.  Indeed, quite the contrary, here the agents specifically sought the Federal Search Warrant when, upon executing the Chippewa County Search Warrant, they observed items at the Carmel Residence that were beyond the scope of the state warrant.  Unlike the facts in *Dzialak*, there is no evidence that the search team ransacked the Carmel Residence, nor is there any evidence that the volume of evidence seized that fell outside the terms of the Federal Search Warrant "far outnumbered" the volume of evidence that fell within the terms of the Federal Search Warrant.  Furthermore, there is no allegation here that only some of the boxes of items seized contained at least some items falling within the scope of the Federal Search Warrant – a degree of accuracy that the *Regan* court found did not reflect the kind of flagrant disregard necessary even to consider suppressing all of the seized evidence.[35]

_____

[35]Carmel's unsupported assertion that "[t]he vast majority of items seized were legal and are to be returned" (Def. Br. at 22), even if true, is irrelevant to the analysis of the validity of the search, especially if, as the defendant himself concedes, those items will be returned. *See, e.g.,* 2 LaFave, *Search & Seizure*, § 4.11(a) ("[S]ometimes the sorting out of the described items from intermingled undescribed items would take so long if performed at the scene that it is less intrusive merely to take that entire group of items to another location and do the sorting there;

Accordingly, defendant's  motion for a blanket suppression order as well as his contention that the seizure was beyond the scope authorized by the Federal Search Warrant should be rejected.

## III.

## DEFENDANT'S REQUEST FOR A *FRANKS* HEARING SHOULD ALSO BE DENIED

Defendant requests a *Franks* hearing averring that Investigator Holum and Special Agent Sellner deliberately or recklessly misled the issuing officers in the affidavits submitted in support of their respective applications for the Chippewa County Search Warrant and the Federal Search Warrant.  As further discussed below, defendant's claims are fatally defective because they are based on conclusory assertions unsupported by affidavit or specific evidence as required by *Franks*, they fail to make the requisite substantial preliminary showing of *scienter* required to obtain the relief they request, and/or they fail to demonstrate the materiality of any of the alleged misrepresentations or omissions to the determination of probable cause.  Because Carmel's conclusory assertions fail to make the substantial preliminary showing required to obtain a *Franks* hearing, this motion should be denied.

A.    **Applicable Law**

In *Franks*, the Supreme Court held that, "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires

_____

and ... sometimes the sorting out must occur elsewhere because that action requires a degree of expertise beyond that of the executing officers."); *see, e.g.,* Sellner Aff. ¶12a (noting that closer inspection required to determine if numerous items observed at Carmel Residence, including, for example, RPGs, grenades, artillery projectiles, etc., were "live").

that a hearing be held." *Franks*, 438 U.S. at 155-56.  "The *Franks* standard is a high one." *Rivera v. United States*, 928 F.2d 592, 604 (2nd Cir. 1991).  Because "[t]here is, of course, a presumption of validity with respect to [an] affidavit supporting [a] search warrant[, t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171.  It is not sufficient to allege negligence or innocent mistake. *Id.*  Furthermore, "[e]very statement in a warrant affidavit does not have to be true." *United States v. Canfield*, 212 F.3d 713, 717 (2nd Cir. 2000) (internal quotation marks omitted).  Rather, to obtain a *Franks* hearing, a defendant must make a substantial preliminary showing that: (1) the warrant affidavit contains a false statement or material omission that makes the affidavit misleading; (2) the false statement or material omission was the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (3) the false statement or material omission was integral or necessary to the judge's probable cause finding. *See, e.g., Franks*, 438 U.S. at 171; *United States v. Martin*, 426 F.3d 68, 73 (2nd Cir. 2005); *United States v. Singh*, 390 F.3d 168, 183 (2nd Cir. 2004); *United States v. Awadallah*, 349 F.3d 42, 64 (2nd Cir. 2003); *Canfield*, 212 F.3d at 717-18; *United States v. Salameh*, 152 F.3d 88, 113 (2nd Cir. 1998); *United States v. Campino*, 890 F.2d 588, 591-92 (2nd Cir. 1989) (affirming trial court's denial of *Franks* hearing "because appellants failed to produce evidence of deliberate falsehood or recklessness in the affidavit").  Allegations of deliberate falsehood or of reckless disregard for the truth "must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  *Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily*

*explained. Allegations of negligence or innocent mistake are insufficient*." *Franks*, 438 U.S. at 171 (emphasis supplied); *see also Singh*, 390 F.3d at 183-84 ("conjecture" concerning intentional or reckless omission of information from affidavit not sufficient to warrant a hearing).

Omissions are less likely to present "'a question of impermissible official conduct'" because allegations of omissions may result in "'endless conjecture about investigative leads, fragments of information, or other matters that might ... have redounded to defendant's benefit'" had they been included." *United States v. Lopez*, No. 96 Cr. 105 (RSP), 1997 WL 567937, at *2 (N.D.N.Y. Sept. 11, 1997) (quoting *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997)). "[T]he mere intent to exclude information is insufficient." *Awadallah*, 349 F.3d at 67-68 (citing *United States v. Colkley*, 899 F.2d 297, 300-01 (4th Cir. 1990)). As the Fourth Circuit stated in *Colkley*,

> An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation. However, every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly. If . . . this type of 'intentional' omission is all that *Franks* requires, the *Franks* intent prerequisite would be satisfied in almost every case . . . . [Rather,] *Franks* protects against omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*, the magistrate.

*Colkley*, 899 F.2d at 300-01 (emphases in original).

The case law makes clear that, even when alleging a *Franks* violation based on the theory of "reckless disregard," rather than intentional misrepresentation, a defendant must show that the affiant acted with *scienter*. "To prove reckless disregard for the truth, the defendant must prove that the affiant 'in fact entertained serious doubts as to the truth' of the

45

allegations." *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002) (quoting *United States v. Williams*, 737 F.2d 594, 602 (7th Cir. 1984) (citing *United States v. Davis*, 617 F.2d 677, 694 (D.C. Cir. 1979) (holding that the First Amendment definition should be applied by analogy in the *Franks* setting))); *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994) (same)); *see United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001) (citation omitted); *United States v. Millar*, 79 F.3d 338, 342-43 (2nd Cir. 1996) (upholding denial of *Franks* hearing where there was no evidence of "deliberate prevarication"); *United States v. Rivera*, 728 F. Supp. 250, 258 (S.D.N.Y. 1990) (Mukasey, J.), ("If [the affiant] made statements which failed to take account of the facts as he knew them, or which he *seriously doubted* were true, that would show reckless disregard for the truth.") (emphasis added), *vacated on other grounds*.  "Because states of mind must be proved circumstantially, a fact finder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations." *United States v. Perez*, 247 F. Supp. 2d 459, 473 (S.D.N.Y. 2003) (quoting *United States v. Whitley*, 249 F.3d 614, 620 (7th Cir. 2001)).  However, "'[a]llegations that amount to negligence or innocent mistake do not constitute the required showing.  The focus is not on whether a mistake was made, but rather the intention behind the mistake.'" *United States v. Cook*, 348 F. Supp. 2d 22, 29 (S.D.N.Y. 2004) (citing *United States v. Markey*, 131 F. Supp. 2d 316, 324 (D. Conn. 2001)).

## B.    The Holum Affidavit Provides No Basis for a *Franks* Hearing

The defendant's argument for a *Franks* hearing in connection with the Holum Affidavit was rejected by the Magistrate Judge and District Court Judge in the Western District of Wisconsin.  Although the defendant here does not specify with precision those aspects of the

Holum Affidavit that he claims would give rise to a *Franks* hearing, the defendant argued in Wisconsin that Investigator Holum's failure to reveal that while the top handles found in Carmel's vehicle were used as the functional part for machine guns, they could also be used with a legal semiautomatic weapon. As noted above, the magistrate judge considered this argument and found that while it would be material for the Court to know that top handles for illegal M16s can also be used on legal weapons, Carmel had not made a substantial preliminary showing that Investigator Holum actually knew this or that he intentionally or recklessly failed to include this information in the affidavit. (*See* Magistrate Order at 2). The defendant also relied on what he described as Investigator Holum's failure to verify the defendant's statement that he was licensed to possess one machine gun with the ATF. The magistrate judge rejected this argument, finding that, by reporting the defendant's claim that one of his machine guns was registered and legal, Investigator Holum placed material exculpatory information before the court, and did not state or imply that the defendant was lying. (*Id.*). The magistrate concluded that Holum's failure to investigate whether the defendant's claim actually was true would be at most negligence; his failure to report a finding (if he made one) that Carmel's claim was true could not be material because it merely would be corroboration of a statement that stood uncontradicted in the affidavit. (*Id.*).

In other words, as the Magistrate Judge in Wisconsin, upheld by the District Court Judge, correctly found, the material facts that the issuing officer *did* need to know — that the defendant claimed to have a license to possess a machine gun, that the defendant stated to the UC that he had three machine guns, that the defendant admitted possessing machine gun barrels, and that the defendant possessed two top handles, which *are* used for machine guns — were all

set forth in the Holum Affidavit. Accordingly, as correctly found by both the federal magistrate and the federal district court judge who previously reviewed these arguments in connection with the Holum Affidavit, there is no basis for a *Franks* hearing.

**C.      The Sellner Affidavit Provides No Basis for a *Franks* Hearing**

It does not appear that defendant argued for a *Franks* hearing in connection with the Federal Search Warrant in the Western District of Wisconsin. Here, however, defendant claims that the Federal Search Warrant application contains "inaccurate representations" in the Sellner Affidavit and the incorporated Iadovito Complaint, including the following: (1) that "Mr. Carmel was never a 'supply officer' on the USS Shrike" as stated in the Iadovito Complaint (Def. Br. at 20); (2) that "Mr. Carmel was not 'relieved of his duties as supply officer for misappropriating government property and mis[use] of his authority" as stated in the Iadovito Complaint (*id.*); (3) the Iadovito Complaint "falsely states that the USS Shrike 'purchased' PEQs during the time that Mr. Carmel was aboard" (*id.*); and (4) the Sellner Affidavit "is misleading in stating, in paragraph 10, that PEQs 'are not available in the civilian market' ... [which] is contradicted by an earlier sentence in the same paragraph that says PEQs are 'manufactured by Insight Technology, INC. for the US Military and approved Law Enforcement agencies ....'" (*id.* at 20-21).

In fact, as noted previously herein, all of these assertions were based on information obtained by either Special Agent Sellner or Special Agent Iadovito through their investigation from reliable sources, some corroborated by documentation; there is no basis to consider any of these statements to be false, much less that they were put forward by the affiants "with deliberate falsehood or recklessness," *Campino*, 890 F.2d at 591-92. Regarding

48

defendant's first three points, notwithstanding Carmel's claims in his brief to the contrary, the

agents' assertions that (1) Carmel was a "supply officer" on the Shrike, (2) he was relieved of

those duties due to misuse of his authority, and (3) the Shrike purchased PEQs while Carmel was

assigned to the ship, were firmly premised on information gathered during their investigation,

that included an interview with Carmel's supervisor (as set out in the Complaint) and

computerized records of supply orders from military depots to the Shrike which reflect that

PEQs were ordered to the Shrike using Carmel's username and that of another individual.[36]  In

addition, Carmel himself told law enforcement agents in his post-arrest statement that he had the

authority to order materials for the Shrike along with this other individual.  Finally, as noted, the

Sellner Affidavit is in fact accurate in stating that PEQs are not available on the civilian

market[37]; as set out in documentation recently provided to the defense, Insight Technology's

agreement with law enforcement agencies in connection with the sale of PEQs and other related

items includes a provision that "[s]ale of these laser aiming lights is restricted to government,

military, and law enforcement agencies under a direct purchase order from the agencies, and

*shall not be sold or transferred to individual law enforcement or civilian personnel.*"  *See* Exhibit

I (emphasis supplied).

In sum, the Sellner Affidavit supplied the Magistrate Judge with pertinent and

reliable information about Carmel, about his dealings with the UC, and the various items found

---

[36]As noted above, these documents were provided to the defense in the Government's
first Rule 16 production on February 12, 2008.

[37]Note that "civilian" in this context plainly refers to that market which is outside both
the military and law enforcement.  Although maybe not the most obvious usage of "civilian," it
is not uncommon. *See, e.g., The Random House Dictionary of the English Language* 378 (2nd ed.
1987) (defining a "civilian" as "n. 1. a person who is not on active duty with a military, naval,
police or fire fighting organization ....").

at the Carmel Residence, and did not omit anything material to the finding of probable cause.

Defendant has failed to produce any evidence, through affidavit or otherwise, contradicting these

facts, let alone that Special Agent Sellner (or Special Agent Iadovito through the Iadovito

Complaint) knew any of these assertions to be incorrect or recklessly avoided knowing they were

incorrect.  *Franks* demands more than the mere conclusory allegations propounded by a

defendant.  The defendant has failed to make the substantial preliminary showing required by

*Franks*, and his request for a *Franks* hearing should be summarily denied.

## IV.

### THE INVENTORY PROVIDED IN CONNECTION WITH THE SEARCH COMPLIED WITH THE REQUIREMENTS OF RULE 41(F)

Carmel claims that "the Government failed to provide a sufficient inventory of

items seized," contending that "[t]he paperwork is so broad and vague in its description of items

as to be useless." (Def. Br. at 22).  Alleging that this constitutes an "intentional disregard of Rule

41 with respect to filing an inventory of property taken," Carmel contends that the seized items

should be suppressed. (*Id.*).  This argument is baseless.[38]

Rule 41(f) requires that "[a]n officer present during the execution of the warrant

must prepare and verify an inventory of any property seized.  The officer must do so in the

presence of another officer and the person from whom, or from whose premises, the property is

taken.  If either one is not present, the officer must prepare and verify the inventory in the

presence of at least one other credible person." Fed. R. Crim. P. 41(f)(1)(B).  The rule goes on to

require that "[t]he officer executing the warrant must promptly return it — together with a copy

of the inventory — to the magistrate judge designated on the warrant.  The judge must, on

---

[38]This argument was not made previously before the Western District of Wisconsin.

request, give a copy of the inventory to the person from whom, or from whose premises, the property was taken and to the applicant for the warrant." Fed. R. Crim. P. 41(f)(1)(D).

        As set forth above, and in the Inventory attached as Exhibit F, the agents upon executing the search prepared a 47-page inventory chart, containing, for many items, detailed descriptions of the item, and where in the Carmel Residence it was seized, and by whom; for numerous other items, they provided a general description of the item, and where in the Carmel Residence it was seized, and a general identification of who seized it.  This inventory on its face more than complies with the requirements of Rule 41; there is no basis for defendant's contention that it does not.

        Moreover, it is generally accepted that the statutory provisions of Rule 41 "are not grounded in the Fourth Amendment" but rather are "ministerial only" and thus do not give rise to suppression "'absent a showing of prejudice.'" *See* 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 4.12 (4th ed. 2004) (noting that "the 'overwhelming wight of authority' is to the effect that required warrant return procedures are ministerial and that failure to comply with them is not a ground for voiding an otherwise valid search") (citing *United States v. Kennedy*, 457 F.2d 63 (10th Cir. 1972) (footnotes and additional citation omitted); *see also* 2 LaFave, *supra*, § 4.12 (distinguishing cases involving more "serious omission[s]" — such as the "complete failure to make a return (as opposed to a return which has minor defects in form and nature)" when "the remedy of exclusion is called for").  "[V]iolations of Rule 41 alone should not lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the

Rule." *United States v. Burke*, 517 F.2d 377, 386 (2nd Cir 1975); *see also United States v. Adams*, 401 F.3d 886, 893 (8th Cir. 2005) (suppression not required absent showing of prejudice for violation of Rule 41(f)) (citation omitted); *United States v. Motz*, 936 F.2d 1021, 1025 (9th Cir. 1991) ("Failure to comply with Rule 41 requires suppression of property seized only where agents would not have carried out the search and seizure had they been required to follow the rule and where they 'intentional[ly] and deliberate[ly] disregard[ed] ... a provision of the Rule.'") (citation omitted); *United States v. Dudek*, 530 F.2d 684 (6th Cir. 1976) ("[T]he failure to make a prompt return and to verify the inventory ... have no relation at all to the command of the Fourth Amendment which bars unreasonable searches and seizures" and does not justify seizure, quoting prejudice standard set forth in *Burke*, 517 F.2d at 386, *supra*, and noting preferred alternative remedies, such as adjournment if needed).

Carmel cannot show any actual prejudice from any alleged deficiency in this Inventory, let alone the high standard required to justify a suppression based on an alleged violation of Rule 41, despite Carmel's claim that "[n]obody — not the Court, the agents, the prosecutors, Mr. Carmel, or his lawyers — can determine from this inventory what was seized" (Def. Br. at 22).  First, the inventory sets out precise descriptions of a number of items and their seizure location, and further sets out more general descriptions of numerous other items and their seizure location; all of the descriptions, whether the most precise, detailing the serial number and make of a particular firearm, or the more general description (*e.g.,* as Carmel quotes "[m]isc gun parts, box of magazine, box of misc parts, box of gun parts, box of scopes, box of gun parts, box of gun parts ....") provides sufficient information for Carmel and anyone else to understand the nature of the specific items seized.  Moreover, should there still be any concern, Carmel was also

provided with a compact disk containing photographs taken during the search as part of the

Government's February 12, 2008 Rule 16 discovery.[39]  Finally, Carmel was advised by the

Government in connection with its February 12, 2008 production, that he was free to request to

inspect any of the items seized and arrangements would be made to assist him.[40]  In other words,

should he still have uncertainty after reviewing the Inventory about which items were seized, he

has both the compact disk and the opportunity to inspect the items.

       Thus, even if the Court were to credit his claim of some uncertainty in identifying

which items were seized based on the Inventory — at least for those items for which only a

vague description is offered in the Inventory — this claim does not remotely meet the standard

required to contemplate suppression, that is, that "agents would not have carried out the search

and seizure had they been required to follow the rule and where they 'intentional[ly] and

deliberate[ly] disregard[ed] ... a provision of the Rule." *Burke*, 517 F.2d at 386.  Carmel has

presented no basis for suppression of any of the items seized, let alone all of them, based on the

claimed violation of Rule 41.[41]

---

[39]A copy of this disk is included as Exhibit J.

[40]To date, Carmel's counsel has not made such a request.

[41]Carmel's request that the Government "be required to demonstrate a chain of custody, well in advance of trial, for any items from the Carmel residence which is offered in evidence" (Def. Br. at 23) is also baseless.  He has provided no justification for such a requirement.  It is well-settled that chain-of-custody goes to weight of the evidence, not admissibility. *See, e.g., United States v. Morrison,* 153 F.3d 34, 57 (2nd Cir. 1998); *United States v. Dhinsa*, 243 F.3d 635, 658 (2nd Cir. 2001) (requirement of authentication or identification as condition precedent to admissibility in Fed. R. Crim. P. 901(a) "does not erect a particularly high hurdle" and can be satisfied "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification."); *United States v. Stuckey*, 2007 WL 2962594 at * 7 (S.D.N.Y. October 10, 2007) (RPP) (unreported); *United States v. Gomez Castrillon*, 2007 WL 2398810 (S.D.N.Y. August 15, 2007) (CM) (unreported) ("'Breaks in the chain of custody do not bear upon the admissibility of the evidence, only the weight of the evidence.'") (quoting *Morrison*,

**V.**

**DEFENDANT'S MOTIONS FOR *BRADY* AND *GIGLIO*
MATERIAL SHOULD BE DENIED**

**A.     The Defendant's Request for an Order Directing the Government To Disclose
Additional Alleged *Brady* Material Is Baseless and Should Be Denied**

The defendant asks the Court to direct the Government to produce all material

that it is required to produce pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Under

*Brady*, the Government has a constitutional obligation to disclose favorable evidence to the

accused where such evidence is material to guilt or to punishment. *See id. at 87*; *United States v.

Coppa*, 267 F.3d 132, 139 (2nd Cir. 2001).  A *Brady* obligation exists where nondisclosure of a

particular piece of evidence would deprive the defendant of a fair trial. *See United States v.

Coppa*, 267 F.3d at 140.  *Brady* applies only to "the discovery ... of information which *had been

known to the prosecution* but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103

(1976) (emphasis added).  This disclosure obligation has clearly been "limited to evidence in the

Government's possession and has not been extended to create a Government obligation to assist

the defense in extracting from others evidence the Government does not have." *United States v.

Turkish*, 623 F.2d 769, 775 (2nd Cir. 1980); *see also United States v. Avellino*, 136 F.3d 249, 255

(2nd Cir. 1998) ("The Brady obligation extends only to material evidence ... that is known to the

prosecutor"); *see also Morgan v. Salamack*, 735 F.2d 354, 358 (2nd Cir. 1984) ("A prosecutor is

not constitutionally obligated to obtain information dehors his files for the purpose of

discovering information which defense counsel can use in impeaching the credibility of a

prosecution witness.").

---

153 F.3d at 57).

54

By its February 12, 2008 discovery letter to defense counsel, the Government acknowledged its obligations under *Brady* and its progeny and informed defense counsel that the Government would provide impeachment material, pursuant to *Giglio v. United States*, 450 U.S. 150, 154 (1972), if any, at the time it provides prior statements of witnesses pursuant to the Jencks Act, 18 U.S.C. § 3500. The Government also informed defense counsel at that time that the Government was unaware of any *Brady* material and that the Government would provide timely disclosure if any such material came to light. Should this change, the Government will abide by its *Brady* obligations. Based on this standing commitment by the Government, the defendant's motion for production of *Brady* material should be denied. *See United States v. Martinez-Martinez*, 01 Cr. 307 (AGS), 2001 WL 1287040 at *5 (S.D.N.Y. Oct. 24, 2001) (accepting similar *Brady* representation from the Government, "as district courts in this Circuit commonly do").

The defendant erroneously contends that *Brady* requires the Government to disclose the following information, all of which is well outside the scope of *Brady*:

(1) the number of PEQs manufactured by Insight Technologies and the number that are shipped "to both the military and civilian market" (Def. Br. at 25);

(2) the civilian purchasers of PEQs, including quantities and dates of shipments (*id.*);

(3) "how the [DOD] tracks PEQs after receiving them ..., whether by serial number or some other method" (*id.*);

(4) DOD's "method of disposal of PEQs when no longer in use" (*id.*); and,

(5) "the dates on which [DOD] obtained the four PEQs in question and the dates,

if ever, that the items were discarded" (*id.* at 25-26).

None of the above constitutes heretofore undisclosed *Brady* material — that is, information in the possession of the Government and not available to the defense that is material and exculpatory. At bottom, the defendant appears to be seeking this wide array of information to support a theory that he somehow could have obtained the three PEQs which he sold to the UC by some means other than stealing them himself from the Government. However, the defendant misses the point of the Government's position. The Government has charged the defendant with selling the PEQs without authority; whether the defendant personally stole the PEQs is not an element of that offense (although the evidence does strongly suggest that the defendant did personally steal these items). Moreover, as noted in the Iadovito Complaint, and in the materials provided to the defendant through the Government's Rule 16 discovery, the three PEQs that the defendant sold to the UC were traced based on their serial numbers to sales by Insight to the military (Iadovito Complaint, ¶¶ 7, 8, 9); the Complaint also sets out the DOD's regulations regarding disposing of such items, namely, that they are supposed to be effectively demilitarized (*id.* ¶3a). Accordingly, the data that the defendant is requesting on *all* of Insight's sales of other PEQs is beside the point, and certainly is not *Brady*. Although Carmel is of course free to request this sales information or any other information from Insight that he considers "relevant" on his own (*e.g.,* the number of PEQs manufactured by Insight, the number that are allegedly shipped "to both the military and civilian market" (Def. Br. at 25), and the alleged civilian purchasers of PEQs), *Brady* imposes no obligation on the Government in connection with the information he seeks[42]. (Of course, the Government's position, as set forth in the

---

[42]In addition, Insight is a private company that happens to do business with the Government; it is not within the Government's control. *Brady* "has not been extended to create

Iadovito Complaint and set out above, is that PEQs are *not* available on the civilian market.  That defendant refuses to accept that position does not present the Government with any *Brady* obligation — neither *Brady* nor any other due process principle requires the Government to embark on evidentiary inquiries to support speculative defense claims that the Government has no basis to credit.)

Moreover, any documents the Government has obtained from DOD or Insight that the Government intends to use in its case-in-chief, or even, indeed, that the Government has broadly considered relevant to this investigation, have already been provided to the defense pursuant to (and indeed well beyond) the Government's Rule 16 obligations.  For instance, defendant demands that the "Government ... be required to disclose [DOD's] method of disposal of PEQs when no longer in use" (Def. Br. at 25); this was set out, with citations, in the Iadovito Complaint. *See* Iadovito Complaint, ¶3a ("[W]hen any of these devices are no longer in military use, their key 'points' or components are to be cut, crushed, broken, or melted 'to the degree required to preclude repair or restoration to original intended use.'") (quoting Defense Demilitarization Manual 4160.21-M-1, Category XII (B), (E)(1) (October 1991)).  Documents already provided to the defense through Rule 16 disclosure include requisition, purchase and inventory records related to the military's purchase of PEQs, including copies of the military's correspondence and contracts with Insight, which were provided to the defense on February 12, 2008 (Bates stamped #186 - 319), and a sample Insight contract with law enforcement that includes the condition that the law enforcement agency not transfer the devices to any unauthorized law enforcement agency or civilian (Exhibit I).  The Government also provided on

_____

a Government obligation to assist the defense in extracting from others evidence the Government does not have." *Turkish*, 623 F.2d at 775.

February 12, 2008, a list of the serial numbers of the PEQs and related items taken from the

Carmel Residence at the time of the search (Bates stamped #152-168); and by letter dated April

11, 2008, a list of the serial numbers of the four PEQs Carmel sold to the UC.  (Of course,

defendant's demand that the Government provide "the dates, if ever, that these [four PEQs] were

discarded" (Def. Br. at 25) is illogical: as defendant should know, the Government's position is

that they were never"discarded" because Carmel sold them to the UC.).  In other words, the

defendant has all the pertinent information in the Government's possession related to Insight and

its sale of PEQs to the DOD and DOD's handling of PEQs that is relevant to the Government's

investigation of Carmel.  Neither *Brady* nor any other obligation, constitutional or statutory,

requires the Government to provide more or different information that is not in its possession.[43]

The defendant's bald assertion that  "[s]uch information is highly relevant

because the Government has no direct evidence that [Carmel] stole PEQs or that those PEQs

were ever in a location where he would have had access to them" (Def. Br. at 26) misses the

point even were it true.  Carmel's underlying premise here — that the Government's alleged lack

of "direct evidence" as to whether defendant himself stole the PEQs has any relevance — is

simply incorrect.  First, the Government does not necessarily have to prove that Carmel himself

stole the PEQs, since Carmel is charged with *selling* stolen property, and aiding and abetting the

same, not with stealing the property himself.  *See, e.g., United States v. Souza,* 304 F.2d 274,

276-77 (9th Cir. 1962) (noting difference between "part of § 641 which makes it an offense to

---

[43]Of course, as the Government has previously noted in its correspondence with the defense, the Government is aware that its disclosure obligations are ongoing.  If the Government, through its continuing investigation, acquires any other information or documentation from Insight or any other source that is exculpatory or that it intends to use in its case-in-chief,  it will disclose that material consistent with its *Brady* and Rule 16 obligations respectively.

embezzle, steal, purloin, or knowingly convert to his own use or the use of another of property of the United States ... [and] that part of the Section ... which makes it an offense to sell, without authority, property of the United States" and deciding that instruction was proper where jury was instructed that it had to find that defendant "sold and conveyed the property ... without authority, and with knowledge that at the time of each such sale ... the property belonged to the United States and had been stolen from the United States."); *cf. United States v. Baker*, 693 F.2d 183, 185 (D.C. Cir. 1982) (where defendant was charged with unauthorized selling of government property, "statutory requirement that the stolen property belong[s] to the government merely furnishes the basis for federal jurisdiction").  Moreover, it is well-settled that the Government can prove its case with circumstantial evidence, so long as the evidence presented to the jury proves the defendant's guilt of the charged crime beyond a reasonable doubt. *See*, *e.g., United States v. Glenn*, 312 F.3d 58, 64 (2nd Cir. 2002) ("[T]he prosecution may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt.").  In any event, the Government has provided the defendant already with documentation that belies the factual basis of this faulty premise, including, for example, the DRMO records showing that PEQs (along with other items) were ordered to the Shrike from military depots while Carmel was assigned to it.

Accordingly, the defendant's request for an order directing the Government to disclose additional alleged *Brady* material is baseless and should be denied.

**B.     The Defendant's Request for an Order Directing Early Production of *Giglio* Material Should Also Be Denied**

At the same time, Carmel's request for the early production of *Giglio* and § 3500 material lacks merit.  Carmel requests impeachment material for the Government's witnesses "30

days before trial." (Def. Br. at 26-27).  This request is meritless and should be denied.

The Second Circuit has held in *United States v. Coppa*, 267 F.3d 132, 145-46 (2nd Cir. 2001), that the Government is not required to produce *Giglio* material until it produces "3500 material" pursuant to the Jencks Act, so long as the Government provides the *Giglio* material in time for effective use at trial.  The Jencks Act, moreover, prohibits the Court from ordering the disclosure of statements by Government witnesses before their direct testimony at trial.  *Coppa*, 267 F.3d at 145.  In light of *Coppa*, the Government will produce *Giglio* material in sufficient time for its effective use at trial.  *See, e.g., United States* v. *Triana-Mateus*, 98 Cr. 958 (SWK), 2002 WL 562649 at *2 (S.D.N.Y. Apr. 15, 2002) (denying defendant's motion for disclosure of exculpatory and impeachment evidence 30 days in advance of trial; material must only be produced "so as to enable the defendant to use the material effectively at trial"); *United States v. Greyling*, 00 Cr. 631 (RCC), 2002 WL 424655 at *2 (S.D.N.Y. Mar. 18 2002) (production of *Giglio* material by the Wednesday before the week in which a witness will testify is appropriate); *United States v. Conley*, 00 Cr. 816 (DAB), 2002 WL 252766 at *2-3 (S.D.N.Y. Feb. 21, 2002) (*Coppa* requires denial of defendant's request for immediate disclosure of *Brady*/*Giglio* material).

Following the usual practice in this District, the Government intends to produce impeachment material when it provides prior statements of a witness pursuant to 18 U.S.C. § 3500 — that is, the Friday before the trial is scheduled to begin, or, if additional time is reasonably required to review the material, sufficiently in advance of the witness' testimony to avoid delay of the trial.  As courts have consistently found, this practice is fully in accordance with the requirements of *Brady*, *Giglio*, and *Coppa* — providing ample time for the defense to

make effective use of any impeachment information. Moreover, we currently know of nothing in the *Giglio* material for the Government's witnesses that will require defense counsel to take weeks and weeks to review prior to trial. Accordingly, the defendant's request for disclosure of impeachment material "at least 30 days before trial" should be denied.

### CONCLUSION

For all of the foregoing reasons, a hearing should be scheduled on David

Carmel's motion to suppress his statement; Carmel's motions to suppress the evidence seized

from his residence should be denied in their entirety without a hearing; and Carmel's motions for

*Brady* and *Giglio* material should also be denied.


Dated: June 2, 2008
New York, New York

                              Respectfully submitted,

                              MICHAEL J. GARCIA,
                              United States Attorney for the
                              Southern District of New York,
                              *Attorney for the United States of America*



                        By: _____/s/_____
                              Rosemary Nidiry
                              Assistant United States Attorney
                              (212) 637-1063

## LIST OF EXHIBITS

Exhibit A     –     Complaint

Exhibit B     –     Signed waiver of rights form

Exhibit C     –     Interview Report

Exhibit D     –     Chippewa County Search Warrant and application

Exhibit E     –     Federal Search Warrant and application

Exhibit F     –     Inventory

Exhibit G     –     WDWI Magistrate Order, Magistrate Report & Recommendation, and District Court Order

Exhibit H     –     WDWI Plea Agreement

Exhibit I     –     Sample Insight Technology Agreement

Exhibit J     –     Compact disk of photographs from search

## CERTIFICATE OF SERVICE

The undersigned attorney, duly admitted to practice before this Court, hereby certifies that on the below date, she served the following document in the manner indicated:

GOVERNMENT'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT'S PRE-TRIAL MOTIONS

Service via Clerk's Notice of Electronic Filing upon the following attorney, who is a Filing User in this case:

Donald Yannella, Esq.
Attorney for Defendant

Dated:    New York, New York
          June 2, 2008

                              _____/s/_____
                              Rosemary Nidiry
                              Assistant United States Attorney
                              (212) 637-1063