UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,     :

                             :       **ECF FILING**

                             :

      - against -            :       07 Cr. 537 (WHP)

                             :

                             :

DAVID CARMEL             :

              Defendant     :

--------------------------------------------------------X

REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTIONS TO SUPPRESS
PHYSICAL EVIDENCE AND FOR
DISCLOSURE OF EXCULPATORY MATERIAL

Dated: New York, New York        DONALD YANNELLA, P.C.
       August 28, 2008           Attorney for Defendant
                                 DAVID CARMEL
                                 7 Dey Street, Suite 803
                                 New York, NY  10007
                                 (212) 226-2883

I am counsel for David Carmel, and this memorandum is submitted in reply to the Government's opposition to the defense motions to suppress physical evidence and for disclosure of exculpatory evidence. The page and paragraph references indicated below refer to the prosecutor's 63-page opposition papers.

The Government implies (Page 3, paragraph 2, lines 1-4) that the investigation of Mr. Carmel was initiated because of illegal conduct by Mr. Carmel over eBay. This is not true. The investigation of Mr. Carmel arose due to information that agents obtained about Mr. Carmel from a confidential informant. That informant's only means to locate Mr. Carmel was via the eBay account of Mr. Carmel's parents. The agents used eBay to contact defendant. The investigation did not arise because of illicit conduct by Mr. Carmel over eBay.

The Government incorrectly states Mr. Carmel's rank in the US Navy (Page 5, paragraph 3, lines 1-3). Mr. Carmel was not a lieutenant or a supply officer while on the USS Shrike. Naval records show that he was a deck officer and additionally the weapons officer.

The Government incorrectly states that Mr. Carmel "was relieved of his duties as supply officer for misappropriating government property and misuse of his authority" (Page 6, Paragraph l, lines 3-5). With respect to

misappropriation of property, it must be noted that the USS Shrike did use night vision goggles. Moreover, Mr. Carmel was never punitively relieved of any of his duties. Fitness reports submitted by the commanding officer indicate that Mr. Carmel was doing a good job. He separated from active duty in May of 2005 and moved to Wisconsin.

The Government incorrectly asserts that Mr. Carmel was pulled over in Wisconsin "on an observed traffic violation" (Page 6, paragraph 2, lines 2-3). In fact, Mr. Carmel was pulled over when federal agents conducted a pre-planned arrest after scheduling a meeting with him over the telephone.

The Government inaccurately summarizes Mr. Carmel's post-arrest statement (Page 8, Paragraph l, lines 3-5). During the period that the investigators wanted to know about, defendant did not purchase anything. The defendant had purchased items from Dawson's years earlier, before being on the Shrike. Mr. Carmel did not "change his story."

The Government asserts that, during his post-arrest interview, Carmel "stated he possessed one machine gun, MG M-119, and stated he possessed a license for this weapon from the ATF. (Page 10, paragraph 2, lines 1-2). Also, the Government relies on the "Sellner affidavit" which noted that "[b]ased on statements made to the ATF agent, he only possessed a license for one fully automatic weapon" (Page 13, paragraph 1, line 3). While it is

3

true that defendant admitted possession of a machinegun and license, he never said that he possessed <u>only</u> one machinegun. Defendant refused to answer further questions regarding his guns.

The Government asserts that, during a phone conversation with his father, Mr. Carmel told his father "that the feds had arrested him, and that his father could guess what for" (Page 10, paragraph 2, lines 7-8). This is not a fair summary of Mr. Carmel's statement and it is taken out of context.

The Government relies on Magistrate Judge Crocker's Report and Recommendation, in which he noted that an internet search "puts the lie" to Carmel's implication that the MG3, MG34, and HK32 "might have legal cousins." (Page 18, Footnote 15). Magistrate Judge Crocker is not a gun expert and should not rely on a cursory internet search. In fact, semi automatic variants for all three guns do exist.

The Government argues that, although the warrant application omits the material fact that the two "top handles" observed in Carmel's vehicle could also be used for a legal version of the illegal M-116, there is "no suggestion that Investigator Holum actually knew this" (Page 28, paragraph 2, lines 14-15). Investigator Holum's ignorance of this material fact undercuts his credibility and reliability.

The Government disputes the defense allegation that Sellner's affidavit is "misleading in stating… that PEQs are not available in the civilian market." However, the Government acknowledges that civilian law enforcement agencies purchase PEQs. The Government argues that civilian law enforcement agencies are contractually bound with the manufacturer not to redistribute the PEQs (Page 34, paragraph 2, lines 7-12). However, an agreement or contact with the manufacturer and the initial purchaser is not a statute, and it is not illegal or a violation of any penal law to possess a PEQ in the United States. The Government argues that PEQs are regulated by the Food and Drug Administration (FDA), but FDA regulations also apply to basic food items which are not illegal to possess. The Government fails to provide any documentation or citation regarding FDA regulation of PEQs.

The Government incorrectly argues that the Sellner affidavit provided probable cause based, in part, upon "information regarding Carmel's previous activity involving sales of weapons …" (Page 38, paragraph 2, line 5-6). However, a PEQ is not a weapon. Carmel never sold any weapons, nor is there any evidence to support that claim.

Mr. Carmel disagrees with the assertion by Chad Holum, in his application for an "Order Sealing Search Warrant," dated May 30, 2007, that "[t]his matter is deemed a sensitive investigation involving dangerous

weapons and homeland security."  This exaggerates the seriousness and scope of both the state and federal investigations.

The initial search warrant, issued in Chippewa County, was to search for machine guns at the request of the federal agents from New York. The Wisconsin state court application says that information was supplied primarily of Agent Kai Chan. However, the state search warrant application misstates the facts of the federal investigation.  The second paragraph states that "Carmel was the target of an ICE investigation involving the theft, sale and diversion of stolen military supplies INCLUDING WEAPONS."  This information, supplied to both the county commissioner and the federal magistrate in the subsequent federal warrant, is intentionally misleading. There is no reason to believe that Mr. Carmel was involved in the theft, sale, or diversion of weapons.  Either Chan failed to inform Holum of this, thereby deliberately misleading him, or Holum misled the county commissioner.  Holum was apparently led to believe that there were missing military machineguns that Mr. Carmel was under investigation for stealing. That is the conclusion that an uninformed party would logically come to after reading the application. Agent Chan also failed to inform Holum that the guns in the application, if original, are from Germany. There is no way they could have been stolen from the U.S. Navy.  Despite Holum's

unsubstantiated claim of weapons expertise, it is apparent that he is severely lacking in that department as he thought that Mr. Carmel had a "MG M-119". There is no machinegun with that designation in existence. This fact was observed by the federal magistrate, but not given any real weight.

Also excluded from the warrant applications is the fact that federal agents had checked with ATF and verified that Mr. Carmel did in fact have a machinegun license, as well as a license for silencers and for destructive devices. The County Commissioner was left to ponder the accused's  "bald and unverified claim" that he had a machine gun license. Given the omission of pertinent facts and the context of the surrounding circumstances, such a claim by Mr. Carmel would most likely be viewed as dubious.

Agent Chan reported that Carmel admitted to having pieces of tanks, bullet shells, and machinegun barrels, but Agent Chan conveniently excluded the fact that Carmel owned and operated a legal business buying and selling gun parts and military collectibles.

The state warrant alleges violation of Wisconsin machinegun law Sec 941.26 (1)a and 941.27 1a and b. Agent Chan had to have been aware that this was inaccurate because ATF would not have issued Mr. Carmel a license, which Chan knew had been issued, if it would put Mr. Carmel in violation of state or local law. Wisconsin law only prohibits machineguns

7

that have been "converted" to a pistol caliber. Even Agent Chan's cursory

internet search would have shown that the caliber of the weapons in question

are 7.92 x 57mm and 7.62 x 51mm, which are large rifle calibers. The

weapons are large and cumbersome guns. There is no suggestion that a pistol

caliber conversion had been performed, and any person familiar with

machineguns would tell you that such a proposition is laughable. It is

obvious that Holum, despite his claim of expertise, is either willfully

ignorant, careless, or intentionally misleading in this respect.

Mr. Carmel had been the subject of a federal investigation for over a

year, and the federal agents had ample time to get a federal search warrant.

Agents asked for Mr. Carmel's permission to search within 30 seconds of his

arrest and he refused to give it.  Instead, they used the county police officer

and the county commissioner to falsify a machinegun search warrant and

rush it through in order to try to insulate the federal agents from their bad

acts. There was no other reason for the rush. Mr. Carmel was in custody, and

the agents had secured the Carmels' property. The truth of the matter is that

the agents from the onset wanted to search for laser sights, which was the

focus of their investigation, not machineguns. The county police were

coached to help search for these even before Mr. Carmel was arrested. This

is evidenced by paragraph 9, lines ll-14, in the Sellner affidavit, which says

that the federal agents accompanied the county police to find "the guns." They were immediately directed by Mr. Carmel's father to where the guns were (see Bates#25) but continued to search everywhere after they had secured the guns, in excess of 7 more buildings. This was clearly a general search after they found the guns they claimed to be looking for. The probable cause in the federal search warrant was dependent almost entirely on what they found during the execution of their illegal general search. The reasons for the state warrant and its restrictions were completely ignored.

Also at issue is the scope of the warrant and what was seized outside of it. Bates #10 is a specific list of items to be seized. Beyond what was on that list, truck loads of items were seized, including knives and commercial radios. Neither Holum, the machinegun expert, nor the ATF agents on the scene could identify what the majority of the guns were. It was reported that the agents had to purchase a book from Barnes and Noble in order to help them identify many of the antique and foreign guns. Bates 110-115 lists over 80 firearms, including pistols, rifles, shotguns and black powder guns that were, without question, not machineguns and were not to be seized. Bates ll6-147 notes an extremely large and very vague description of stuff taken by agents in the machine shop building. The searching agents had in their possession a detailed list of the items they were investigating. They showed

the list to Mr. Carmel during his post arrest interview. They made no attempt to restrict their seizure to illegal materials or the items detailed in their list. Almost no attempt was made to identify the items, count the items, or even tag the items. During the course of the machinegun case, numerous guns were produced that never appeared anywhere in the search warrant return.

Many machineguns, which obviously would merit the most important attention to detail, were taken without any record of their seizure. Because this is true, one cannot begin to fathom what else might have been taken without any record or inventory.  Not only is that a violation of Mr. Carmel's rights to property, it is outright theft and an abuse of authority. Even if, as the prosecutor argues, some boxes of items were described as "box of stuff" because it was easier to sort and inventory later at another location, this was never done.  Dozens of wood pallets were taken from Mr. Carmel's property to load the items on to trucks. The Carmel family's forklifts, and other equipment were used without permission, along with fuel taken from their tanks. Permission was never asked even though the county police knew exactly where to reach Mr. Carmel's parents as they had been forced to leave their home. 18 USC 641 makes it a crime to use government equipment or services without permission.

The Government erroneously argues that information requested by the defense, in Point 3 of the defense motion, regarding the Department of Defense's purchase and disposal of PEQs is not *Brady* material (Page 55, # (3) and (4)).  How the DOD tracks PEQS is highly pertinent and potentially exculpatory, as are the method of disposal and records of the same. The Government should be required to provide documentation and information requested in Point 3 of the defense motion.

## CONCLUSION

For the reasons stated above, the defendant requests that this Court grant the motions, together with such other relief that this Court may deem just and proper.

Dated:  August 28, 2008                    Respectfully submitted,

                                           Donald Yannella, P.C.

                                              /s/

                                     By: _____
                                     Donald Yannella, Esq.
                                     7 Dey Street, Suite 803
                                     New York, NY  10007
                                     (212) 226-2883

Declaration of Service

Donald Yannella, an attorney duly admitted to practice law in the United States District Court, Southern and Eastern Districts of New York, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

(1)  Today, I served a copy of the attached motion upon the following individual:

AUSA Rosemary Nidiry
One St. Andrew's Plaza
New York, NY  10007
VIA ECF

Dated:  August 28, 2008

/s/

_____
Donald Yannella, Esq.

12